

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

**UNITED STATES OF AMERICA**

**v.**                                        **CRIMINAL NO. 4:24:CR** ⏐0

**JAMES MICHAEL FISHER**                      18 U.S.C. § 1001(a)(1)
                                              18 U.S.C. § 1001(a)(2)
                                              18 U.S.C. § 1512(c)(1)
                                              18 U.S.C. § 1519

## INDICTMENT

The Grand Jury charges that:

1.      On July 10, 2017, a United States Marine Corps KC-130 transport aircraft (hereinafter, "Yanky 72") on a classified mission crashed in Leflore County, Mississippi, in the Northern District of Mississippi, killing all fifteen Marines and a Navy Corpsman onboard. Immediately following the crash, the United States Marine Corps commissioned a team of Marine Corps investigators to determine the cause and responsibility for the crash.

2.      In 2018, following a lengthy investigation, the Marine Corps investigators concluded that the cause of the crash was a defective propeller blade that should have been repaired in the late summer of 2011 during routine maintenance at Warner Robins Air Logistics Complex at Robins Air Force Base, Warner Robins, Georgia (collectively, "Robins"). The investigators further concluded that unnamed civilian maintenance personnel at Robins were primarily responsible for the crash. Specifically, the investigators concluded that maintenance personnel were grossly negligent in following procedures that would have detected the blade's defects.

1

3. Because of these conclusions, in 2020, federal agents opened a criminal investigation in the Northern District of Mississippi to attempt to identify the individuals at Robins whose gross negligence was responsible for the crash.

4. During the criminal investigation, federal agents learned that the earlier Marine Corps investigators were misled about what maintenance procedures were in place in the late summer of 2011. Federal agents discovered that in August 2011, engineers at Robins authorized the removal of a critical inspection procedure for detecting C-130 propeller blade defects. This removed procedure was one of the procedures that the unnamed civilian maintenance personnel were blamed for negligently performing. The Marine Corps investigators were never provided documentation showing the critical inspection procedure was removed and did not know that it was removed. Therefore, the Marine Corps investigators did not scrutinize whether the decision to remove the procedure was related to the cause of the crash or consider whether the engineers had any responsibility for causing the crash.

5. JAMES MICHAEL FISHER was the C-130 lead propulsion system engineer at Robins from 2011 to 2022. FISHER was the primary engineer responsible for C-130 propeller maintenance in 2011. FISHER was also one of the key decisionmakers who removed the critical inspection procedure in August 2011. As the lead engineer responsible for C-130 propeller maintenance, FISHER was primarily responsible for providing federal agents during the criminal investigation with information regarding what inspections procedures were in place in the late summer of 2011.

2

6.      FISHER attempted to obstruct the criminal investigation by intentionally withholding documents showing that he played a crucial role in removing the critical inspection procedure and providing false statements to federal agents in order to cover up his role in removing the critical inspection procedure.

## General Allegations

### The C-130 Propeller Blade Maintenance Process

7.      After a certain number of flight hours, Air Force and Navy C-130s were required to undergo depot-level maintenance, which required a complete breakdown, inspection, and overhaul of the entire aircraft, including the propeller.

8.      Robins provided depot-level maintenance and engineering support for the Air Force's C-130 fleet.

9.      The Air Force had a long-standing agreement with the Navy to perform maintenance on the Navy and Marine Corps C-130 fleet at Robins. The Navy C-130 fleet made up approximately 5% of Robins C-130 inventory.

10.      The C-130 System Program Office ("System Program Office") consisted of civilian engineers responsible for approving and maintaining the procedures for how C-130's were inspected and overhauled at Robins. The System Program Office, along with a Navy liaison at Robins, was responsible for coordinating with the Navy on its procedures for inspection and overhaul of Navy C-130s.

11.      From 2011 to 2022, FISHER was the lead C-130 System Program Office Propulsion System Engineer. In that capacity, he had the authority to recommend changes,

3

modifications, and alterations to the Air Force's C-130 propeller inspection and overhaul procedures. He also coordinated with the Navy on its procedures for propeller blade inspection and overhaul.

12.     As a part of the overhaul process, C-130 propeller blades were removed from the hub assembly and inspected for defects. This process included inspection of the C-130 propeller blade taper bore. The taper bore was a tapered, hollow area inside the base of the propeller blade. The C-130 propeller blade taper bore was to be inspected for cracking and corrosion.



**C-130 Propeller Blade Taper Bore**

13.     In 2011, there were three potential inspections for identifying cracking or corrosion within the taper bore: (1) a borescope inspection, (2) a fluorescent penetrant inspection, and (3) an

eddy current inspection. The fluorescent penetrant inspection and eddy current inspection were called nondestructive inspections.

14.     Borescope inspections required a borescope technician to use a magnifying probe attached to a flexible cable to visually inspect the taper bore for cracking or corrosion.

15.     Eddy current inspections required a maintenance technician to move an electromagnetic probe along the surface of the taper bore. The probe was attached to a monitor. If the probe sensed a crack or corrosion, it would send an amplified signal to the monitor. This amplification indicated to the technician that there was something potentially wrong with the taper bore at the identified area.

16.     Fluorescent penetrant inspections ("penetrant inspections") required a technician to apply fluorescent penetrant within the taper bore and let the penetrant dwell in the taper bore for a period of time. The penetrant was then removed from the surface of the taper bore and a black light was shined into the taper bore to identify areas where the penetrant had seeped into any cracking. Penetrant inspections were the most time consuming of the inspections.

17.     Penetrant inspections could be performed by fully immersing the blades into the penetrant or by wiping or spraying the penetrant onto the blade. Full immersion was recommended for depot maintenance, and the spray-on or wipe-on method was intended for field maintenance.

18.     In 2011, the Air Force and Navy maintained separate manuals for inspecting and overhauling C-130 propeller blades. These manuals, known as Technical Manuals or Tech Manuals, contained different procedures for inspecting and overhauling Air Force and Navy propeller blades.

5

19.     At all times herein, Robins civilian personnel who performed the inspections on the C-130 propeller taper bores ("maintenance technicians") were required to follow inspection procedures in the Tech Manuals unless a System Program Office engineer provided written authority to deviate from a Tech Manual procedure.

20.     If a maintenance technician needed to deviate from an inspection procedure required by a Tech Manual, a maintenance technician supervisor would electronically submit a Nonconforming Technical Assistance Request and Reply Form, known as an Air Force Materiel Command Form 202 ("Form 202"), to the System Program Office requesting permission to deviate from the Tech Manual.

21.     The request would be assigned to a System Program Office engineer, who would be responsible for researching the request and making a recommendation to approve or deny it. If the Form 202 request was to alter a nondestructive inspection procedure, the assigned engineer was encouraged to consult with a nondestructive inspection engineer at Robins outside of the System Program Office, known as a Level 3 engineer. Level 3 engineers had the specialized training and expertise to offer informed advice. After consulting with the Level 3 engineer, the assigned engineer would make a recommendation to a secondary engineer within the System Program Office, who had the final authority to either approve or deny the request.

22.     If approved, the Form 202 was provided to the maintenance technicians, who were required to follow the Form 202's instruction instead of the Tech Manual.

23.     Form 202s could be specific to a single part, that is, one-time permission to deviate in a single instance. Form 202s also could be specific to all parts of one type, that is, standing

6

permission to do that same thing to all similar aircraft parts for a period of time. That latter type was known as a Blanket Form 202. A Blanket Form 202 gave 120-day approval to maintenance technicians to deviate from the relevant procedure required by the Tech Manual.

24. A Blanket Form 202 automatically rescinded after 120 days, at which time the relevant portion of the Tech Manual controlled again. A Blanket Form 202 was only to be renewed a limited number of times before the System Program Office was required to permanently incorporate the alteration into the Tech Manual.

25. The Air Force required the maintenance technicians to indicate on documents that accompanied the propeller blades ("Work Control Documents") what inspection procedures were actually performed on the C-130 propeller blades, either pursuant to the Tech Manual or a Form 202. From 2011 until after July 10, 2017, the Air Force had a policy that Work Control Documents should be destroyed after two years.

### Taper Bore Inspection Process at Robins from 2011 to 2017

26. From 2011 to 2017, the System Program Office had at least one operative Blanket Form 202 altering the nondestructive inspection requirements on the C-130 propeller taper bore. Blanket Form 202s were often used interchangeably between Air Force and Navy propeller blades, regardless of what was specified on the form. From 2011 to 2017, maintenance technicians at Robins performed the same inspections for Navy and Air Force C-130 propeller taper bores.

27. Before August 22, 2011, maintenance technicians stopped performing borescope inspections because that requirement was removed for the Air Force Tech Manual sometime before 2011.

7

28.     Before August 22, 2011, maintenance technicians were required to perform wipe-on penetrant inspections on both Navy and Air Force C-130 propeller taper bores pursuant to a long-standing Blanket Form 202. Robins did not have the capability to fully immerse C-130 propeller blades as required by both Tech Manuals.

29.     Before August 22, 2011, maintenance technicians were required to perform eddy current inspections on all Navy C-130 propeller taper bores and were required to perform eddy current as a back-up inspection on Air Force taper bores if corrosion and cracking was found by the penetrant inspection. Robins only had one set of eddy current testing probes for the Navy and Air Force, even though the Tech Manuals had different probe requirements. Before August 22, 2011, maintenance technicians had repeatedly reported to their supervisors and other engineers at Robins that the eddy current probes being used were unreliable.

30.     Despite maintenance technicians' concerns about the eddy current probes, on August 19, 2011, a maintenance technician supervisor emailed FISHER requesting permission to remove the penetrant requirement for C-130 propeller blade taper bores. The supervisor claimed penetrant inspections were "very time consuming" and that eddy current inspections were finding cracking within taper bores.

31.     Within a few hours after receiving the August 19 email request, FISHER stated, "I have no problem with removing the requirement for dye penetrant[,]" after briefly providing his rationale for approving the request.

32.     On August 22, 2011, another maintenance technician supervisor initiated a Form 202 formalizing the request to remove penetrant inspections. The request contained the notation

8

"ATTN: MIKE FISHER" and contained the same language from FISHER's email, stating that the rationale for removing the request was "PER MIKE FISHER C-130 PROPULSION SYSTEM ENGINEER."

33.     That same morning, System Program Office engineers recommended and approved the request, and penetrant inspections were removed pursuant to the August 22, 2011 Blanket Form 202 ("August 22 Form 202").

34.     Neither FISHER nor the other System Program Office engineers contacted either of the two Level 3 nondestructive inspection engineers at Robins about removing the penetrant inspections. The Level 3 engineers had the training and expertise to determine whether removing penetrant inspections was advisable.

35.     After August 22, 2011, penetrant inspections were not conducted on Navy and Air Force blades. The only inspection performed on Air Force and Navy propeller blades was the eddy current inspection, which was being performed with eddy current probes that maintenance technicians had reported were unreliable.

36.     In August 2011, Navy C-130 propeller blade, serial number N844995A (the "P2B4 Corroded Propeller Blade"), manufactured in 1983, was introduced into Robins' inventory for inspection and overhaul. Navy records showed that the inspection and overhaul process for the P2B4 Corroded Propeller Blade was completed by September 12, 2011.

37.     The P2B4 Corroded Propeller Blade had corrosion and intergranular cracking approximately 3 inches within its taper bore when introduced at Robins.

38.    The intergranular cracking was not detected and remediated at Robins, and the corroded propeller blade was allowed to reenter the Navy C-130 fleet.

39.    It is not clear when or what inspections were performed on the P2B4 Corroded Propeller Blade because the Work Control Documents were destroyed pursuant to Air Force policy.

40.    The P2B4 Corroded Propeller Blade was eventually installed on Propeller 2 as Blade 4 on the Marine KC-130 Hercules, Bureau Number 165000 ("Yanky 72").



**Blade Numbering System**

41.    In late 2011, the Level 3 nondestructive inspection supervising engineer ordered another Level 3 nondestructive inspection engineer to conduct an evaluation of the reliability of the eddy current probes because of the concerns raised by the maintenance technicians.

42.    In February 2012, the nondestructive inspection engineer issued a report of his findings, concluding that the eddy current probes used for inspecting both Air Force and Navy C-130 propeller taper bores were not reliable. The nondestructive inspection supervising engineer communicated the findings of the report to FISHER, who did not immediately respond.

43. From April 2012 to September 2012, the nondestructive inspection supervising engineer attempted to communicate the eddy current probe findings to FISHER, through a series of emails, each of which went unanswered. Finally, in September 2012, FISHER responded to the supervising engineer "since we are already using penetrant I would be happy with just eliminating the use of these probes . . . " even though penetrant inspections were not being performed after August 22, 2011.

44. During this same time, FISHER continued to recommend reliance on the eddy current inspection as the only nondestructive inspection performed on both Air Force and Navy propeller taper bores. FISHER was the assigned engineer on the Blanket Form 202s approved on November 14, 2012, March 6, 2013, and July 23, 2013. These Blanket Form 202s recommended continued reliance on the eddy current inspections in lieu of penetrant inspections.

45. From August 22, 2011 to December 13, 2013, penetrant inspections were not conducted on either Air Force or Navy propeller taper bores. Eddy current remained the only nondestructive inspection on Air Force and Navy propeller taper bores until December 13, 2013, when the System Program Office engineers approved a Blanket Form 202 changing the inspection method back to the wipe-on penetrant inspections. The unreliable eddy current probes were taken out of service.

46. After December 13, 2013, maintenance technicians resumed performing penetrant inspections as the only test to identify cracking and corrosion within all Air Force and Navy C-130 propeller blade taper bores. Robins did not resume performing eddy current inspections on C-130 propeller blade taper bores until sometime after July 10, 2017, the date of the Yanky 72 crash.

11

**The Yanky 72 Crash**

47.     On July 10, 2017, call sign "Yanky 72" was assigned to Marine KC-130 Hercules, Bureau Number 165000, which was in service with the Marine Aerial Refueler Transport Squadron 452 ("Transport Squadron 452") based at Stewart Air National Guard Base, New York. Yanky 72's mission was to support the transportation of United States Marines and equipment from Marine Corps Air Station Cherry Point, North Carolina to Navy Air Facility El Centro, California.

48.     On July 10, 2017, Yanky 72 departed Cherry Point en route to El Centro, California. The flight included eight United States Marines and one Navy Corpsman from Transport Squadron 452, and seven United States Marines from the 2d Raider Battalion, Marine Corps Special Operations.

49.     While flying over Leflore County, Mississippi, which is in the Northern District of Mississippi, the P2B4 Corroded Propeller Blade broke apart. The detached propeller blade initiated a series of catastrophic events, resulting in the crash of Yanky 72 and the death of all passengers and crew. The accident was classified as a Class A Aviation Mishap.

**The JAGMAN Investigation**

50.     On July 11, 2017, one day after the catastrophic accident, the United States Marine Corps Commanding General, 4th Marine Aircraft Wing, appointed a lieutenant colonel with the United States Marine Corps Reserve to "conduct an investigation, as soon as practical, into the circumstances surrounding the Class A aviation mishap within [Transport Squadron 452] on 10

July 2017 . . . ." This investigation was commonly known as the Judge Advocate General Manual ("JAGMAN") investigation.

51.     The JAGMAN investigation began at the site of the Yanky 72 crash in the Northern District of Mississippi. Marine command instructed the JAGMAN investigation as follows: "You must investigate fault or neglect of anyone involved. You will determine the cause and responsibility for the mishap, describe all damage to property, and make a line of duty determination for all Marine casualties."

52.     Approximately one month after the accident, Navy engineers who had examined the Yanky 72 wreckage discovered that the cause of the crash might be due to the P2B4 Corroded Propeller Blade. Further, Navy engineers determined that the P2B4 Corroded Propeller Blade last underwent depot-level maintenance at Robins in August 2011. The Navy engineers concluded that the P2B4 Corroded Propeller Blade had cracking and corrosion in the taper bore before it was submitted for inspection at Robins in August 2011.

53.     Following this discovery, before the JAGMAN investigative team visited Robins, independent Navy and Air Force engineering teams initiated separate, independent audits of the sufficiency of the processes at Robins for identifying cracking and corrosion within the C-130 propeller taper bore. Both the Navy and Air Force engineering teams were safety-focused, and, unlike the JAGMAN investigation, not tasked with assessing fault for the accident.

54.     To prepare for the arrival of the Navy and Air Force safety engineering teams, maintenance technicians gathered Blanket Form 202s in their possession and provided them to their supervisors. Additionally, System Programs Office engineers, including FISHER, and Level

13

3 nondestructive inspection engineers prepared presentations for the safety engineering teams' visits to Robins, including presentations into C-130 propeller blade taper bore inspection procedures.

55.     The Blanket Form 202s were not provided to the safety engineering teams. Neither the Navy nor the Air Force team was told about the Blanket Form 202s removing penetrant inspections from August 22, 2011, to December 13, 2013. Both engineering teams were led to believe that at the time P2B4 Corroded Propeller Blade was inspected, maintenance technicians should have been following the Navy Tech Manual, with the exception that they were told that maintenance technicians were performing wipe-on penetrant inspections instead of the full-immersion required by the Navy Tech Manual.

56.     Following the safety engineering audits, the JAGMAN team visited Robins on November 9, 2017, and again on February 26, 2018, to determine why no one detected the cracking and corrosion within the taper bore of the P2B4 Corroded Propeller Blade before it was placed back into service.

57.     During these visits, the JAGMAN team conducted a walk-through audit of the maintenance technicians' shop for a demonstration of the C-130 blade overhaul processes. Maintenance technicians were asked to perform a wipe-on penetrant inspection, an eddy current inspection, and a borescope inspection for the JAGMAN team. Maintenance technicians were provided with a new eddy current testing kit before the arrival of the JAGMAN team, even though eddy current testing had not been performed since December 13, 2013.

14

58.    In addition, the JAGMAN team was provided with the Navy Tech Manual as the relevant guidance for which inspections should have been performed in 2011. The JAGMAN team was never provided the Blanket Form 202s in place in 2011. The JAGMAN team was never informed that penetrant inspections had been removed on August 22, 2011.

59.    Because of the walk-through demonstrations and the documents provided, the JAGMAN team was misled to believe that maintenance technicians were working from the Navy Tech Manual in 2011, and not from the Blanket Form 202s that altered inspection procedures.

60.    The JAGMAN team was also led to believe that it was not possible to speak with the maintenance technicians who performed the nondestructive inspections in 2011 because it would be difficult to determine the identities of the technicians without the Work Control Documents, which had been destroyed before the Yanky 72 crash.

61.    The JAGMAN team was never told that maintenance technicians had raised concerns about the reliability of eddy current probes in 2011 and that a Level 3 engineer completed a report in 2012 confirming that the probes were unreliable.

**The JAGMAN Report**

62.    On August 30, 2018, the JAGMAN team issued a comprehensive report ("JAGMAN Report") containing its findings of fact, opinions, and recommendations as to the cause and responsibility for the Yanky 72 crash. The JAGMAN Report relied, in part, on documents and information provided by the Navy and Air Force engineering teams that had conducted the earlier safety audits.

15

63.     The JAGMAN Report found that corrosion and cracking was present in the P2B4 Corroded Propeller Blade when it was introduced at Robins and that the corrosion and cracking "was not removed during the last overhaul performed by [Robins] in September 2011."

64.     The JAGMAN Report concluded: "The propeller overhaul process and publications for [Navy] blades at [Robins] in 2011, while not optimal, still required technicians to identify and remove existing corrosion. [Robins] failed to remove existing and detectable corrosion and pitting and [intergranular cracking] on [the P2B4 Corroded Propeller Blade] in 2011, which ultimately resulted in its inflight liberation. This blade liberation was the root cause of the mishap."

65.     The JAGMAN Report's findings and conclusions were based, in part, on the opinion of the Navy Propeller Team Chief, who concluded: "I believe the corrosion was advanced enough in 2011 that it should have been detected by a properly trained technician conducting the standard overhaul procedures [in accordance with the Navy Tech Manual] for Navy blades at [Robins] in 2011."

66.     The final paragraph of the JAGMAN Report concluded: "The culture at [Robins] from 2011 to 2017 resulted in gross negligence of depot level maintenance personnel and practices that are the direct causal factor for the mishap."

67.     In sum, the JAGMAN Report primarily blamed maintenance technicians for the crash, stating that they were grossly negligent and primarily responsible for the mishap. FISHER and the System Program Office avoided scrutiny. Their engineering decisions in 2011 were not included in the report or named as a causal factor for the Yanky 72 crash. The JAGMAN Report

16

failed to reference the removal of penetrant inspections and the maintence personnel's reliance on faulty eddy current probes when performing eddy current inspections in 2011.

**Specific Allegations**

**Federal Agents Open a Criminal Investigation into the Cause of the Crash**

68.     In early 2020, the Air Force Office of Special Investigations ("AFOSI"), working with the Defense Criminal Investigative Service ("DCIS") and Naval Criminal Investigative Service ("NCIS"), opened a criminal investigation in Northern District of Mississippi into the cause of the Yanky 72 crash. The targets of the investigation were the unnamed maintenance personnel whose gross negligence, according to the JAGMAN Report, was primarily responsible for the Yanky 72 crash.

69.     In April 2021, federal agents attempted to identify personnel at Robins who might have knowledge of maintenance issues relevant to the Yanky 72 crash. Federal agents conducted a telephonic interview with the C-130 System Program Office Chief Engineer. During this interview, the chief engineer told federal agents that the Navy and Air Force Tech Manuals established the requirements for blade inspection in 2011. When asked whether there were any processes to waive Tech Manual requirements, the chief engineer explained the Form 202 process to deviate from the Tech Manuals. The chief engineer stated that the System Program Office reviewed the Form 202s from 2011 but found nothing relevant. The chief engineer told agents that FISHER was responsible for answering Form 202 requests in 2011 and that FISHER would be someone for the agents to speak with during the investigation.

17

**FISHER Provides False Information about the Cause of the Crash**

70.     In May 2021, federal agents travelled to Robins to conduct initial interviews. The information provided during these interviews was consistent with the information contained in the JAGMAN report.

71.     During the visit, federal agents interviewed FISHER. FISHER told federal agents that he heard a rumor that maintenance technicians may not have detected the cracking and corrosion within the P2B4 Corroded Propeller Blade because they had been relying on "tribal knowledge," rather than the Tech Manuals, to incorrectly perform penetrant inspections. FISHER did not inform federal agents that System Program Office engineers had approved a Blanket Form 202 in 2011 removing penetrant inspections of propeller taper bores.

72.     Following the first visit, on or about June 4, 2021, a federal agent emailed FISHER, copying the chief engineer, to request a point of contact who could review "Form 202s to determine whether there were any relevant requests to deviate from [penetrant inspection] procedures in place in 2011." The agent also requested the portions of the Air Force Tech Manual relevant to nondestructive inspection procedures for C-130 propeller taper bores. The purpose of this request was to ensure the "tribal knowledge" mentioned by the System Program Office engineers was not authorized by a Blanket Form 202.

73.     FISHER immediately responded that he had already performed a cursory search of the Form 202s before the agents arrived at Robins but that he should be able to perform a complete search. He also provided portions of the Air Force Tech Manual.

18

74.     The next day, FISHER stated to the agent that his search of the Form 202 system revealed 489 Form 202s in 2011 related to Air Force propellers and that he would screen them for any Form 202s in 2011 that permitted maintenance technicians to deviate from the penetrant inspection procedures established in the Tech Manuals. FISHER also asked for additional time to complete the screening. The agent agreed to the extension request.

75.     On June 6, 2021, the chief engineer, who was copied on the correspondence with FISHER and the federal agent, reminded FISHER and the agent that the Navy procedures should be relevant to the crash, not the Air Force procedures. On June 7, 2021, FISHER responded that "he was just answering the questions as they were asked," and falsely stated to the federal agent that "[with respect to] 202's, the [United States Navy] has zero 202's in the years 2011 and 2012 and only 7 in 2013 which all appear to be aircraft related."

76.     FISHER's statement that there were "zero" Navy Form 202s in 2012 and only 7 Navy Form 202s in 2013 that were aircraft related was false. Federal agents later learned that there were four Navy Blanket Form 202s removing the penetrant inspection requirement between 2011 to 2013. Three of the Form 202s had been assigned to FISHER, who recommended that each of the Form 202s should be approved.

77.     On or about June 23, 2021, approximately one month before returning to Robins for additional interviews, the federal agent emailed FISHER to request an update on the status of the Form 202 research. FISHER did not respond.

**Maintenance Personnel Provide New Information about the Cause of the Crash**

78.     On or about July 20, 2021, federal agents returned to Robins to conduct interviews of maintenance technicians to attempt to identify which technician may have been grossly negligent in the performance of inspection on Yanky 72. FISHER still had not provided any Form 202s before these interviews.

79.     On or about July 20, 2021, federal agents interviewed multiple technicians who had either performed the nondestructive inspections in 2011 or had knowledge of what inspections were being performed in 2011. Some technicians were the same technicians that had performed the audit inspections in 2017 and 2018 for the safety engineering teams and JAGMAN team during their visits. These technicians were not notified in advance that they would be meeting with federal agents and had not been interviewed by the JAGMAN team in 2017 and 2018.

80.     During the interviews, the technicians raised a number of issues that were not addressed in the JAGMAN Report. They explained that their supervisors in 2011 cared more about production than safety, disregarded their concerns about the adequacy of the nondestructive inspection procedures, and used the Form 202 process to work around problems they identified, like insufficient equipment.

81.     As proof, several technicians came to these interviews with copies of Blanket Form 202s, including the August 22 Form 202 removing the penetrant inspection requirement. At least one technician was able to retrieve a few Blanket Form 202s from the database shortly before his interview, as news spread that federal agents were asking questions about the Yanky 72 crash. Some technicians had saved emails and other documents showing that in 2011 the technicians were

20

meeting with Level 3 nondestructive inspection engineers and raising concerns about the reliability of the eddy current probes.

82.     A few technicians recalled Blanket Form 202s being gathered by supervisors and management before the 2017 and 2018 engineering audits. No technician was sure what their supervisors did with the Form 202s they provided.

83.     The technicians believed that their supervisors' focus on production and productivity—and the ease with which Blanket Form 202s could be obtained—caused the corrosion on the P2B4 Corroded Propeller Blade to go undetected. The technicians stated that engineers from the C-130 System Program Office would have known about the Blanket Form 202s because of the prevalence of Form 202s.

84.     After interviewing the technicians and reviewing the Form 202s they provided, a federal agent contacted FISHER to tell him that the investigation had uncovered what appeared to be Form 202s directly relevant to the cause of the Yanky 72 crash. The federal agent requested a meeting.

**FISHER Provides More False Information about the Cause of the Crash**

85.     On or about July 21, 2021, FISHER met with federal agents to discuss the Form 202s. Before the agents could tell FISHER which Form 202s they had uncovered, FISHER voluntarily provided the August 22 Form 202. FISHER admitted to the agents that the August 22 Form 202 was a new revelation that changed the root cause conclusion as to why maintenance technicians missed the cracking on the propeller blade that caused the Yanky 72 crash.

86.     FISHER, whose name was on the Form 202, denied knowing about its existence and denied approving it. Specifically, Fisher stated that he would not have approved removal of penetrant inspections because deviating from penetrant inspections would result in corrosion going undetected. He stated that a penetrant inspection would have detected the corrosion and pitting in the taper bore that led to the intergranular crack that caused the P2B4 corroded propeller blade to fail. FISHER stated that he could not understand why his System Program Office colleagues would approve such a Form 202. FISHER further claimed that he would never have approved the August 22 Form 202 because in 2011 there were problems with the reliability of eddy current probes.

87.     In addition to the August 22 Form 202 that ended penetrant inspections, FISHER provided one other Form 202 from 2011 that extended the removal of penetrant inspections on October 26, 2011 ("October 26 Form 202"). Like the August 22 Form 202, FISHER's name appeared on the October 26 Form 202, but he was not the assigned or approving engineer, which was consistent with his statement to federal agents that he would not have approved the August 22 Form 202.

88.     FISHER's statement that he would have never removed the penetrant inspections was false. Federal agents later uncovered the August 19, 2011 email in which FISHER stated that he had "no problem" removing the penetrant inspections and also discovered the other Blanket Form 202s in 2012 and 2013 in which FISHER, as the assigned engineer, had recommended removal of penetrant inspections.

89.     On or about July 26, 2021, FISHER sent a federal agent a follow-up email: "I extended the search to 2012 per our discussion last week—no findings. I also did a search on 2010-

2013 including the phrase 'eddy current' with the parameters I used previously and found 4 total 202s, the 2 we discussed last week and two others that were not relevant to the search. In summary, the 202 guidance would have been relevant from 22 Oct 2011 until it ran out at the end of the 120 days after the second 202 was approved, roughly the end of Feb 2012."

90.     FISHER's statement was false. Federal agents later learned that the guidance ended on December 13, 2013, when the System Program Office finally reinstated penetrant inspections with a Blanket Form 202. Federal agents later learned that FISHER was the primary decisionmaker in resuming penetrant inspections in 2013, more than one year after he had been informed by the Level 3 engineers in April 2012 that the probes used for performing eddy current inspections were unreliable.

91.     Based on FISHER's statements, the System Programs Office engineers who approved the August 22 Form 202 became the focus of the investigation. Federal agents now understood that they could no longer trust FISHER to provide Form 202s.

**Federal Agents Discover FISHER's Obstruction and False Statements**

92.     In August 2021, federal agents returned to Robins to conduct interviews of System Program Office engineers who approved the August 22 Form 202 and to conduct their own review of the Form 202 database since FISHER could not be trusted.

93.     At this time, federal agents asked a Robins employee not connected with the System Program Office to conduct a search of the Form 202 database for Blanket Form 202s relevant to C-130 propeller inspection procedures. Federal agents monitored the employee performing the search. The employee quickly found approximately thirty Blanket Form 202s that related to

23

changes to nondestructive inspection procedures for C-130 propeller blade taper bores starting in 2008, when the database was created, and ending in 2017 after the crash.

94.     After reviewing these Blanket Form 202s, federal agents realized that there were multiple relevant Blanket Form 202s that FISHER had not provided. Federal agents discovered that FISHER was the assigned engineer on three Form 202s on November 14, 2012, March 6, 2013, and July 23, 2013, removing the penetrant inspection requirement on Navy blades. Federal agents also discovered that the guidance removing penetrant inspections ended on December 13, 2013, not roughly the end of February as FISHER had said.

95.     On August 11, 2021, federal agents interviewed the System Program Office engineers who approved the August 22 Form 202. Following these interviews, one engineer provided federal agents with the August 19, 2011 email in which FISHER stated he had "no problem" removing penetrant inspections. This email directly contradicted FISHER's claim that he would never have approved the removal of penetrant inspections.

**FISHER Denies Any Responsibility for the Cause of the Crash and Blames Colleagues**

96.     On or about December 2, 2021, federal agents conducted a recorded interview with FISHER. During the interview, FISHER again denied being aware of Blanket Form 202s before his July 2021 meeting with federal agents. Federal agents again asked FISHER whether he approved the August 22 Form 202. FISHER again denied approving it and again stated that he would have never approved it because of the concerns about the reliability of eddy current probes. FISHER again stated that he could not understand why his colleagues would have approved it. FISHER also stated that Level 3 technicians were not helpful during this time because they would

24

not respond to his requests for assistance. Federal agents finally confronted FISHER with his August 19, 2011 email. FISHER denied remembering the email and stated that, regardless, his colleagues should not have approved the Blanket Form 202 without doing their own research.

97.     The next day, on or about December 3, 2021, FISHER sent federal agents a follow up email. In that email, FISHER again placed blame on his System Program Office engineers who approved the August 22 Form 202.

## COUNT ONE

98.     Paragraphs 1 through 97 are incorporated herein by reference.

From on or about the day of May 4, 2021, to on or about the day of December 3, 2021,

### JAMES MICHAEL FISHER,

did willfully and knowingly conceal and cover up by scheme a material fact in a matter within the jurisdiction of the executive branch of the Government of the United States, by representing on multiple occasions to criminal investigative federal agents with the Air Force Office of Special Investigations, the Defense Criminal Investigative Service, and the Naval Criminal Investigative Service that he was not aware of Nonconforming Technical Assistance Request and Reply Forms, known as an Form 202s, relevant to the a federal criminal investigation arising out of the Northern District of Mississippi into the cause of the Yanky 72 crash, in violation of Title 18, United States Code, Section 1001(a)(1).

## COUNT TWO

99.     Paragraphs 1 through 97 are incorporated herein by reference.

From on or about the day of July 21, 2021, to on or about the day of December 3, 2021, the defendant,

JAMES MICHAEL FISHER

did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating to criminal investigative federal agents with the Air Force Office of Special Investigations, the Defense Criminal Investigative Service, and the Naval Criminal Investigative Service that he would never have removed the penetrant inspections on August 22, 2011. The statements and representations were false because, as FISHER then and there knew, he gave his approval to remove penetrant inspections in an August 19, 2011 email, and he recommended removal of that procedure on November 14, 2012, March 6, 2013, and July 23, 2013, in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT THREE

100.    Paragraphs 1 through 97 are incorporated herein by reference.

From on or about the day of May 4, 2021, to on or about the day of December 3, 2021, the defendant,

JAMES MICHAEL FISHER,

did corruptly attempt to conceal documents, that is, Nonconforming Technical Assistance Request and Reply Forms, known as a Form 202s, with the intent to impair their availability for use in an official proceeding, that is, a grand jury investigation into the cause of the Yanky 72 crash arising

out of the Northern District of Mississippi, in violation of Title 18, United States Code, Section 1512(c)(1).

**COUNT FOUR**

101.    Paragraphs 1 through 97 are incorporated herein by reference.

From on or about the day of May 4, 2021, to on or about the day of December 3, 2021,

JAMES MICHAEL FISHER,

did knowingly conceal and cover up documents and tangible objects, that is, Nonconforming Technical Assistance Request and Reply Forms, known as Form 202s, with the intent to impede, obstruct, and influence a federal criminal investigation arising out of the Northern District of Mississippi into the cause of the Yanky 72 crash, a matter that the defendant knew and contemplated was within the jurisdiction of the Air Force Office of Special Investigations, the Defense Criminal Investigative Service, and the Naval Criminal Investigative Service, departments and agencies of the United States, in violation of Title 18, United States Code, Section 1519.

A TRUE BILL

_____
CLAY JOYNER
UNITED STATES ATTORNEY

_____*/s/ redacted signature*_____
FOREPERSON