## IN THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

v.                                    Criminal Case No. 4:24-cr-00010-DMB-JMV

JAMES MICHAEL FISHER

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS INDICTMENT

COMES NOW the Defendant, JAMES MICHAEL FISHER, acting by and through his undersigned attorney, and, as support for the Defendant's *Motion to Dismiss Indictment* (which may be referred to hereinafter as the "motion" or as the "Defendant's motion"), which is being filed with this Court pursuant to Rule 47 of the FEDERAL RULES OF CRIMINAL PROCEDURE, submits memorandum of authorities in support of said motion, to-wit:

### I. INTRODUCTION

A Lockheed KC-130T Hercules aircraft belonging to the United States Marine Corps ("USMC") crashed just west of Itta Bena, in Leflore County, Mississippi, on July 10, 2017.[1] The aircraft was known by its radio call-sign "Yanky 72," and is referred to in this case as "Yanky 72."[2] All 16 persons (all members of the United States military) aboard Yanky 72 perished.[3] A criminal investigation into the cause of the Yanky 72 crash was opened in the Northern District of Mississippi in 2020.[4] The *Indictment* [Doc #: 3] herein states: "The targets of the investigation were the unnamed maintenance personnel whose gross negligence ... was primarily responsible for the Yanky

---

[1] See *Indictment* (p. 1, ¶ 1) [Doc #: 3].

[2] See *Indictment* (pp. 1, 12; ¶¶ 1, 47) [Doc #: 3].

[3] See *Indictment* (p. 1, ¶ 1) [Doc #: 3].

[4] See *Indictment* (p. 17, ¶ 68) [Doc #: 3].

**PAGE 1 OF 36**

72 crash."[5] Simply stated, the object of the investigation was to identify a person or persons who could be indicted on 16 charges of negligent homicide under the federal manslaughter statute, 18 U.S.C. §1112, for the deaths of the 16 servicemen aboard Yanky 72; however, no person has ever been charged or indicted for being culpable in the deaths.

The Yanky 72 crash investigation did result in the indictment of the Defendant, James Michael Fisher (who may be referred to hereinafter as "Fisher"), who was charged in a four-count indictment (filed January 25, 2024), which, *inter alia*, alleges:

> FISHER **attempted to obstruct the criminal investigation** by intentionally withholding documents **showing that he played a crucial role in removing the critical inspection procedure** and providing false statements to federal investigators in order to cover up his role in removing the critical inspection procedure.[6]

The indictment against Fisher asserts four (4) criminal offenses (set forth in four (4) "counts") for acts or actions Fisher is alleged to have committed between the dates of July 21, 2021, and December 3, 2021, inclusive. "Count One" claims a violation of 18 U.S.C. §1001(a)(1), alleging:

> ... [Fisher] did willfully and knowingly conceal and cover up by scheme **a material fact** ... **relevant** to the ... federal criminal **investigation ... into the cause** of the Yanky 72 crash ...."[7]

"Count Two" claims a violation of 18 U.S.C. §1001(a)(2), alleging:

> ... [Fisher] did willfully and knowingly make **materially false,** fictitious, and fraudulent statements and representations ... to criminal investigative federal agents ..."[8]

"Count Three" claims a violation of 18 U.S.C. §1512(c)(1), alleging:

---

[5]See *Indictment* (p. 17, ¶ 68) [Doc #: 3].

[6]See *Indictment* (p. 3, ¶ 6) [Doc #: 3] (emphasis added).

[7]See *Indictment* (p. 25, ¶ 98) [Doc #: 3] (emphasis added).

[8]See *Indictment* (pp. 25-26, ¶ 99) [Doc #: 3].

...[Fisher] did corruptly attempt to conceal documents ... known as a [sic] Form 202s, with the intent to impair their availability for use in an official proceeding, that is, a grand jury *investigation into the cause* of the Yanky 72 crash ...."[9]

Lastly, "Count Four" claims a violation of 18 U.S.C. §1519, alleging:

... [Fisher] did knowingly conceal and cover up documents and tangible objects ... known as Form 202s, with the intent to impede, obstruct, and influence a federal criminal *investigation ... into the cause* of the Yanky 72 crash ...."[10]

Thus, the indictment charges Defendant James Michael Fisher with what are known as "process crimes" by alleging specified criminal statutes were violated because Fisher, by acts or actions, knowingly and willfully impeded the investigation into the cause of the Yanky 72 crash that had as its objective identifying a person or persons who could be indicted on 16 charges of negligent homicide.[11]   More specifically, the indictment alleges Fisher made false, fraudulent, or misleading statements to investigators, and concealed material documents that were ***relevant*** to the investigation that was seeking to bring charges of negligent homicide against "... the unnamed maintenance personnel whose gross negligence ... was primarily responsible for the Yanky 72 crash."[12]

Fisher asserts to this Court that the plain language of the indictment reflects that Fisher ***did not*** "cover up ... a material fact," or "make materially false ... statements," or "corruptly attempt to conceal documents," or "conceal ... documents  ... known as Form 202s" that were ***materially relevant*** to the "investigation into ***the cause*** of the Yanky 72 crash" or that would have led to the identification of "... the unnamed maintenance personnel whose gross negligence ... was primarily

---

[9]See *Indictment* (pp. 26-27, ¶ 100) [Doc #: 3] (emphasis added).

[10]See *Indictment* (p. 27, ¶ 101) [Doc #: 3] (emphasis added)..

[11]See *Indictment* (p. 25, ¶ 98) [Doc #: 3].   The acts or actions Fisher is alleged to have committed may be termed "process crime," which are offenses that "interfere with the procedures and administration of justice."  See Murphy, *Manufacturing Crime: Process, Pretext, and Criminal Justice* GEORGETOWN LAW JOURNAL, Vol 97, pp. 1435-2009 (October 7, 2008).

[12]See *Indictment* (p. 17, ¶ 68) [Doc #: 3].

responsible for the Yanky 72 crash."[13]  Therefore, all four counts in the indictment against Fisher should be dismissed..

## II. FACTS RELEVANT TO THE MOTION TO DISMISS

### A.  THE PURPOSE OF THE INVESTIGATION.

The offenses the *Indictment* [Doc. #: 3] alleges Fisher committed are known as "process crimes"; specifically, the indictment alleges Fisher impeded an investigation into the cause of the Yanky 72 crash.[14]  However, the 27-page indictment goes much further than simply alleging four counts of process crimes; the indictment is a "speaking indictment" that recites, in detail, the origin and object of an investigation into the July 10, 2017, crash of Yanky 72.[15]  The crash occurred just north of (and was visible from) U.S. Highway 82 near the county lines of Leflore and Sunflower counties.  All 16 persons on board Yanky 72 perished in the crash.[16]  The loss of 16 American servicemen was a major news event, both domestically and internationally, with news media coverage extending from local Mississippi news outlets such as WABG-TV in Greenwood and WJTV in Jackson, to international outlets such as the British Broadcasting Corporation ("BBC") and *The Guardian* newspaper in the United Kingdom.[17]  Following the crash of Yanky 72, the United

---

[13]See *Indictment* (p. 17, ¶ 68) [Doc #: 3].

[14]See fn. 11, *supra*, for the definition of "process crimes."

[15]See *Indictment* (at p. 1, ¶ 1).  [Doc #: 3].  The aircraft is known by its radio call-sign "Yanky 72," and is referred to in this case as "Yanky 72."  See *Indictment* (p. 12, ¶ 47) [Doc #: 3].

[16]See *Indictment* (at p. 1, ¶ 1).  [Doc #: 3].

[17]See, *e.g.*, https://www.bbc.com/news/world-us-canada-40565556 (*Mississippi crash: Sixteen dead in Marines Corps plane incident*, BBC News, July 11, 2017 (retrieved Feb. 17, 2025), and https://www.theguardian.com/us-news/2017/jul/11/mississippi-dead-military-plane-crash-kc130 ("Military plane crash kills 16 in rural Mississippi," *The Guardian*, July 11, 2017, retrieved Feb. 17, 2025).

States Marine Corps ("USMC") launched an investigation "to determine the **cause** and **responsibility** for the crash."[18] The USMC investigation is referred to in the indictment as "the Judge Advocate General Manual ('JAGMAN') investigation" or simply as the "JAGMAN" investigation, which produced a written report (which is referred to in the indictment as the "JAGMAN report").[19] According to the JAGMAN report, its investigators arrived at the Yanky 72 crash site on July 12, 2017, to begin an investigation.[20] Over twenty percent (20) of the information in the 27-page indictment comes directly from the JAGMAN investigation and the subsequent JAGMAN report; fact allegations set forth in the indictment are based upon information from the JAGMAN investigation, images from the JAGMAN report are reproduced in the indictment (at pp.4, 10; ¶¶ 12, 40), and the JAGMAN report is frequently quoted in the indictment.[21] Although it is not attached to the indictment, the JAGMAN report should be considered effectively as an appendix to the indictment.

---

[18]See *Indictment* (p. 1; ¶ 1) (emphasis added) [Doc #: 3].

[19]See *Indictment* (pp. 12-13; ¶ 50) [Doc #: 3]. The written report produced by the JAGMAN investigation is titled *Command Investigation Into the Class A Aviation Mishap within Marine Aerial Refueler Transport Squadron 452 on 10 July 2017*, which is dated August 30, 2018, and which is referred to in the indictment as the "JAGMAN report". A true and correct copy of the JAGMAN report is attached as "Exhibit A" to the *Defendant's Motion to Dismiss Indictment*. A true and correct copy of the JAGMAN report has also been previously filed with this Court as "Exhibit A" [Doc #: 36-1] to the *Memorandum of Authorities in Support of Defendant's Motion to Dismiss Indictment for Improper Venue* [Doc #: 36].

[20]See "Exhibit A" (JAGMAN report: p. 7, ¶ 2).

[21]The JAGMAN investigation is mentioned or referenced in sixteen (16) paragraphs (to-wit: ¶¶ 1-4, 50-61) of the *Indictment* [Doc #: 3], and the JAGMAN report is cited or quoted in six (6) paragraphs (to-wit: ¶¶ 62-67) of the indictment.

B.    THE JAGMAN REPORT'S CONCLUSION.

Yanky 72 was a Lockheed KC-130T Hercules aircraft powered by four separate engines, and each engine had attached to it a four-blade propeller comprised of four individual propeller blades.[22]

The JAGMAN report states:

> The [JAGMAN ] investigation determined the cause of the mishap to be an in-flight departure of the number four blade from the number two propeller. This propeller blade (P2B4) liberated while the aircraft was flying at a cruise altitude of 20,000 feet. The liberation of P2B4 initiated the catastrophic sequence of events resulting in the midair breaking up of the aircraft and its uncontrollable descent and ultimate destruction.[23]

In other words, the JAGMAN investigation concluded a propeller blade (referred to specifically as "P2B4") broke loose in mid-flight and caused a "catastrophic sequence of events" that caused Yanky 72 to break apart in midair. This finding of the JAGMAN investigation is included in the *Indictment* [Doc #: 3], which specifically alleges:

> While flying over Leflore County, Mississippi, ... the P2B4 Corroded Propeller Blade broke apart. The detached propeller blade initiated a series of catastrophic events, resulting in the crash of Yanky 72 and the death of all passengers and crew.[24]

The indictment alleges that P2B4 was manufactured in 1983.[25] The JAGMAN report states that "USN/USMC C-130 propellers require an overhaul every 5000 or 6000 hours" and states "P2B4

---

[22]A visual depiction of a KC-130 (similar to Yanky 72) depicting the four engines, four propellers, and "Blade Numbering" for the four blades of each propeller is reproduced in the indictment. See *Indictment* (p. 10; ¶ 40) [Doc #: 3]. See also "Exhibit A" (JAGMAN report, p. 8, *Narrative Summary*).

[23]See "Exhibit A" (JAGMAN report, p. 8, ¶ 8). The "P2B4" identifier is essentially an acronym for "Propeller Two Blade Four."

[24]See *Indictment* (p. 12, ¶ 49) [Doc #: 3].

[25]See *Indictment* (p. 9; ¶ 36) [Doc #: 3].

was inducted into WR-ALC for blade overhaul" during the month of August 2011.[26]  The JAGMAN

report recites that "WR-ALC is the last facility that overhauled propeller two and its associated

blades" prior to the July 10, 2017, crash of Yanky 72.[27]  More specifically, the JAGMAN report

recites:

> A post-mishap inspection showed that P2B4 had an intergranular crack (IGC) and radial crack in the vicinity of the bushing bore of the propeller.  This developed from corrosion pitting and intergranular cracking that was present and not removed during **the last overhaul performed by WR-ALC in September 2011**.[28]

The date "September 2011" stated in the JAGMAN report is significant, and likely later misled other

federal investigators and influenced how the investigation was conducted. The JAGMAN report

further recited:

> 159.   ***The intergranular radial crack in blade four***, which ultimately ***was the root cause of this catastrophic mishap***, developed and matured from corrosion pitting and IGC that was not removed during the last blade overhaul in the fall of 2011.

> 160. ***This liberation of P2B4 is the first known occurrence*** of a circumferential fatigue crack initiating from a radial crack which had not grown to pass fully through to the outer diameter blade shank wall of a propeller produced by UTC Aerospace Systems (UTAS). ...
> ...

> 163.   The corrosion damage on P2B4 ***should have been detected and removed***, but was not removed, at WR-ALC during the last overhaul in 2011. ***The lack of detection and removal of this corrosion is attributed to noncompliance with established publications and procedures within them***.[29]

---

[26]See "Exhibit A" (JAGMAN report, p. 27, ¶¶ 141, 144).   This information is also recited in the *Indictment* (p. 9; ¶ 36) [Doc #: 3].  "WR-ALC" is an abbreviation used in the JAGMAN report for The Warner Robins Air Logistics Complex at Robins Air Force Base, Warner Robins, Georgia (see JAGMAN report, p. 27), while the indictment refers to WR-ALC as "Robins"(see *Indictment* (p. 1; ¶ 2)) [Doc #: 3].

[27]See "Exhibit A" (JAGMAN report: p. 27, ¶ 143).

[28]See "Exhibit A" (JAGMAN report: p. 28, ¶ 145) (emphasis added).

[29]See "Exhibit A" (JAGMAN report: p. 31, ¶¶ 159-163) (emphasis added).

The indictment (at p. 14, ¶ 56) alleges:

... the JAGMAN team visited Robins [*i.e.*, WR-ALC] on November 9, 2017, and again on February 26, 2018, ***to determine why*** no one detected the cracking and corrosion within the taper bore of the P2B4 Corroded Propeller Blade before it was placed back into service."[30]

## C.    HOW IS CORROSION IN PROPELLER BLADES DETECTED?

The Yanky 72 crash investigation focused on the failure of P2B4, which the JAGMAN report identified as the "root cause" of the crash, and focused on the inspection procedure relevant to the "blade taper bore" of P2B4.[31]   The indictment recites that in 2011 "the Air Force and Navy maintained separate manuals for inspecting and overhauling C-130 propeller blades" and the "manuals, known as Technical Manuals or Tech Manuals, contained different procedures for inspecting and overhauling Air Force and Navy propeller blades," and the indictment further recites that the "Navy C-130 fleet" made up only five percent (5%) of the "C-130 inventory" at WR-ALC (*i.e.*, Robins).[32] As previously stated, P2B4 underwent inspection and overhaul at WR-ALC (*i.e.*, Robins), which the indictment alleges "was completed by September 12, 2011."[33]   (Again, the "September 12, 2011," date is significant.)

According to the indictment, in 2011 there were three methods to inspect a propeller blade to "identify cracking or corrosion within the taper bore" and those methods were: "(1) a borescope

---

[30]See *Indictment* (p. 14; ¶ 56) (emphasis added) [Doc #: 3].

[31]See "Exhibit A" (JAGMAN report: p. 31, ¶ 159).  See also *Indictment* (pp. 4, 9; ¶¶ 12, 36) [Doc #: 3].  The "blade taper bore" is, essentially, a hole in the propeller blade whereby the blade is affixed to a hub on a shaft on an aircraft's engine; on a C-130 like Yanky 72, four separate and individual blades are affixed to a hub on the shaft of an engine to create a four-blade propeller.  See *Indictment* (pp. 4, 10; ¶¶ 12, 40) [Doc #: 3].

[32]See *Indictment* (pp. 3, 5; ¶¶ 9, 18) [Doc #: 3].  Again, Yanky 72 was the property of the United States Marine Corps ("USMC"); therefore, maintenance procedures applicable to Yanky 72 were those of the United States Navy ("Navy").

[33]See *Indictment* (p. 1, 9; ¶¶ 2, 36) [Doc #: 3].

inspection, (2) a fluorescent penetrant inspection, and (3) an eddy current inspection."[34] The "fluorescent penetrant inspection" (sometimes referred to as "FPI," or, as in the indictment, a "penetrant inspection") and the "eddy current inspection" (sometimes referred to as an "EC" inspection) are "nondestructive inspections" (referred to as "NDI").[35] An "eddy current" inspection involves using an electromagnetic probe along the surface of the taper bore to detect cracks or corrosion (irregularities, such as corrosion, can be detected because the electromagnetic current produced by the EC probe will be measurably disrupted by irregularities such as corrosion).[36] A "fluorescent penetrant inspection" utilizes a substance (a "penetrant") that can seep into surface cracks, and could be performed in two ways (either by fully immersing the blade into the penetrant substance, or by wiping or spraying the penetrant onto the surface of the blade), and, after waiting a specified amount of time after application of the penetrant, the penetrant is wiped from the surface and a technician then uses a "blacklight" to visually inspect whether fluorescing penetrant is observed on the surface (which could indicate the presence of cracking and corrosion).[37] The indictment states that WR-ALC (*i.e.*, Robins) "did not have the capability to fully immerse C-130

---

[34]See *Indictment* (p. 4; ¶ 13) [Doc #: 3]. The indictment recites that "[f]rom 2011 to 2017, maintenance technicians at Robins performed the same inspections for Navy and Air Force C-130 propeller taper bores" and further states that prior to August 22, 2011, "maintenance technicians stopped performing borescope inspections because that requirement was removed for the Air Force Tech Manual sometime ***before*** 2011." See *Indictment* (p. 7; ¶¶ 26-27) (emphasis added) [Doc #: 3].

[35]See *Indictment* (p. 4; ¶ 13) [Doc #: 3].

[36]See *Indictment* (p. 5, ¶ 15) [Doc #: 3].

[37]See *Indictment* (pp. 4-5, ¶¶ 13-17) [Doc #: 3]. See "Exhibit A" (JAGMAN report, pp. 32, ¶ 169).

propeller blades as required by both Tech Manuals."[38]  Therefore, when P2B4 arrived at WR-ALC (*i.e.*, Robins) in August 2011 to be overhauled, the only two NDI inspections being conducted at WR-ALC were a wipe-on FPI examination or an EC test.  It seems obvious that whatever inspection process was utilized (borescope, FPI, or EC), the results of a successful inspection would be almost completely dependent upon the skill, training, and attentiveness of the technician conducting the inspection.

The indictment alleges "[t]he P2B4 Corroded Propeller Blade had corrosion and intergranular cracking approximately 3 inches within its taper bore when introduced at Robins" in August 2011.[39] The indictment provides no basis for this allegation whatsoever (although it seems to come from the JAGMAN report).  The indictment further alleges:

38.     The intergranular cracking was not detected and remediated at Robins, and the corroded propeller blade was allowed to reenter the Navy C-130 fleet.

39.     ***It is not clear when or what inspections were performed on the P2B4 Corroded Propeller Blade because the Work Control Documents were destroyed*** pursuant to Air Force policy.

40.     The P2B4 Corroded Propeller Blade was eventually installed on Propeller 2 as Blade 4 of the Marine KC-130 Hercules, Bureau Number 165000 ("Yanky 72").[40]

The language "It is not clear when or what inspections were performed on the P2B4 Corroded Propeller Blade ..." is significant.

---

[38]See *Indictment* (p. 8; ¶ 28) [Doc #: 3].  Again, the Air Force and the Navy maintained separate manuals for inspecting and overhauling C-130 propeller blades and the Tech Manuals contained different procedures for inspecting and overhauling Air Force and Navy propeller blades. See *Indictment* (p. 5; ¶ 18) [Doc #: 3].

[39]See *Indictment* (p. 9; ¶ 37) [Doc #: 3].

[40]See *Indictment* (p.10; ¶¶ 38-40) (emphasis added) [Doc #: 3].

## D.    A "SMOKING GUN" INDICATING CULPABILITY IN THE YANKY 72 CRASH?

Again, the indictment alleges that in 2011 "the Air Force and Navy maintained separate manuals for inspecting and overhauling C-130 propeller blades" which set "different procedures for inspecting and overhauling Air Force and Navy propeller blades."[41]  With regard to penetrant inspections, the indictment alleges:  "Full immersion was recommended for depot maintenance, and the spray-on or wipe-on method was intended for field maintenance."[42]  Importantly, the indictment alleges:  "Robins did not have the capability to fully immerse C-130 propeller blades *as required by both Tech Manuals*."[43]  Therefore, according to the indictment, no FPI conducted at WR-ALC (*i.e.*, Robins) actually complied with the "Tech Manuals."  However, the indictment alleges that when "a maintenance technician needed to deviate from an inspection procedure required by a Tech Manual" an approval process for the deviation began with a "Nonconforming Technical Assistance Request and Reply Form" referred to as a "Form 202," and when such a Form 202 was approved "maintenance technicians ... were required to follow the Form 202's instruction instead of the Tech Manual."[44]  The indictment alleges a "Form 202" could apply to a single instance, or a "Blanket Form 202" would apply to the same procedure for all aircraft "for a period of time" but Blanket Form 202s were "automatically rescinded after 120 days" and could "only be renewed a limited

---

[41]See *Indictment* (p. 5, ¶ 18) [Doc #: 3].  The JAGMAN report states "Air Force regulations did not require ... borescope inspection, or the eddy current inspection for Air Force blades in 2011," and further reports that although "required by Naval regulations, eddy current inspections were not conducted at the WR-ALC in 2011."  See "Exhibit A" (JAGMAN report, p. 33, ¶¶ 175, 177).

[42]See *Indictment* (p. 5, ¶ 17) [Doc #: 3].

[43]See *Indictment* (p. 8, ¶ 28) (emphasis added) [Doc #: 3].

[44]See *Indictment* (p. 6, ¶¶ 20-21) [Doc #: 3].

number of times before the System Program Office was required to permanently incorporate the alteration into the Tech Manual."[45]

Yanky 72 was an USMC aircraft, and the JAGMAN report recites "[a]n average of five percent of blades processed by WR-ALC were Navy or Marine Corps blades ..." and that although "required by Naval regulations, eddy current inspections *were not* conducted at the WR-ALC in 2011."[46]  (Significantly, other evidence, discussed, *infra*, contradicts this claim.)  Importantly, the JAGMAN report notes that "[a]ll evidence of corrosion must be identified and listed on work control documents by the technician so that the corrosion can be removed by the appropriate process," but, unfortunately, pursuant to "USAF regulations" the "work control documents are destroyed after a period of two years" which means "[a]ll work control documents associated with the 2011 overhaul of P2B4 *no longer exist*" and did not exist when the federal criminal investigation into the cause of the Yanky 72 crash was opened in the Northern District of Mississippi 2020.[47]  It is, therefore impossible to know with certainty the identity of the individual technicians who performed inspections on P2B4, or even what inspections were actually performed, or to know the identity of the technician that gave final approval certifying that PSB4 passed inspection.  Here it should be pointed out that the single individual person who could have had the most culpability in the Yanky 72 crash due to "gross negligence" would be the technician that gave final approval certifying that P2B4 passed inspection and could re-enter the inventory as an overhauled blade available for installation on an aircraft; notably, this person has never been identified by the Government.

---

[45]See *Indictment* (pp. 6-7, ¶¶ 23-24) [Doc #: 3].

[46]See "Exhibit A" (JAGMAN report, p. 33, ¶¶ 176-177 (emphasis added)).

[47]See "Exhibit A" (JAGMAN report, p. 33, ¶¶ 179-181 (emphasis added)).  See also *Indictment* (p. 7, ¶ 25) ("... the Air Force had a policy that Work Control Documents should be destroyed after two years.").

Furthermore, the very objective of the criminal investigation of the Yanky 72 crash opened in 2020 (*i.e.*, a criminal prosecution of "unnamed civilian maintenance personnel" who, because of being "grossly negligent in following procedures that would have detected the blade's defects," were "primarily responsible for the crash") was impossible to achieve before the investigation ever actually began.[48]

> The indictment alleges:
>
> Before August 22, 2011, maintenance technicians were required to perform eddy current inspections on all Navy C-130 propeller taper bores and were required to perform eddy current as a back-up inspection on Air Force blades if corrosion and cracking was found by penetrant inspection. Robins only had one set of eddy current testing probes for the Navy and Air Force, even though the Tech Manuals had different probe requirements. Before August 22, 2011, maintenance technicians had repeatedly reported ... that the eddy current probes being used were unreliable.[49]

The August 22, 2011, date is significant because, as alleged in the indictment, "... penetrant inspections were removed pursuant to the August 22, 2011 Blanket Form 202" (which may be referred to as the "August 22 Form 202").[50] Therefore, according to the indictment's allegations, "[a]fter August 22, 2011, penetrant inspections were not conducted on Navy and Air Force blades" and "[t]he only inspection performed on Air Force and Navy propeller blades was the eddy current

---

[48]See *Indictment* (p. 1, ¶ 2) [Doc #: 3]. Notably, the Government, in its *Government's Response in Opposition to Defendant's Motion in Limine to Dismiss Indictment for Improper Venue* (at p. 7) [Doc. #: 39], makes the claim: On their second trip to Robins, federal criminal investigators successfully identified the maintenance technicians responsible for performing maintenance inspections in 2011 ...." This claim from the Government, at the very least, suggests that the Government has, in fact, identified the technician that gave final approval certifying that P2B4 passed inspection. Again, the entire criminal investigation was predicated upon the Government's belief that some individual person was guilty of an act of "gross negligence" by allowing "the P2B4 Corroded Propeller Blade" to re-enter inventory and become installed on Yanky 72. The Government has claimed this person can now be identified, but no such person has ever been charged or indicted in connection with the Yanky 72 crash.

[49]See *Indictment* (p. 8, ¶ 29) [Doc #: 3].

[50]See *Indictment* (p. 9, ¶ 33) [Doc #: 3].

inspection ...."[51]  The indictment alleges that EC inspections conducted after August 22, 2011, were "... performed with eddy current probes that maintenance technicians had reported were unreliable."[52] Here, the indictment mischaracterizes how an EC inspection is conducted.  First, an EC probe either produces an electromagnetic current and can be calibrated, or it does not and cannot be calibrated, and if it cannot be calibrated, no test can be conducted.  Second, if the EC probe produces an electromagnetic current and can be calibrated, during the EC test either the current is disrupted (which may indicate corrosion), or it is not. Again, if an EC probe does not produce an electromagnetic current or cannot be calibrated, it simply cannot be used and no inspection takes place until a probe can be calibrated, and if a calibrated EC probe does produce an electromagnetic current and the current is disrupted, the object being inspected fails the inspection.  Because the "work control documents associated with the 2011 overhaul of P2B4 no longer exist," it is impossible to know the identity of the individual technicians who performed inspections on P2B4, or what inspections were actually performed, or the identity of the technician that gave final approval certifying that P2B4 passed inspection that allowed it to be placed back into service.[53]  The "reliability" factor of EC probes relates to whether the EC probe could be calibrated, and if it could not be calibrated and no EC test could be conducted, this would cause a slowdown, or even a stoppage, of work at WR-ALC (*i.e.*, Robins).

The indictment (at p. 17, ¶ 69) alleges:

In April 2021, federal agents attempted to identify personnel at Robins who might have knowledge of maintenance issues ***relevant to the Yanky 72 crash***.  Federal agents conducted a telephonic interview with the C-130 System Program Office

---

[51]See *Indictment* (p. 9, ¶ 35) [Doc #: 3].

[52]See *Indictment* (p. 9, ¶ 35) [Doc #: 3].

[53]See "Exhibit A" (JAGMAN report, p. 33, ¶¶ 179-181).  See also *Indictment* (p. 7, ¶ 25) ("... the Air Force had a policy that Work Control Documents should be destroyed after two years.").

Chief Engineer.  During this interview, the chief engineer told federal agents that the Navy and Air Force Tech Manuals established the requirements for blade inspection in 2011.  When asked whether there were any processes to waive Tech Manual requirements, the chief engineer *explained the Form 202 process to deviate from the Tech Manuals*.  The chief engineer stated that *the System Program Office reviewed the Form 202s from 2011 but found nothing relevant*.  The chief engineer told agents that [James Michael] FISHER was responsible for answering Form 202 requests in 2011 and that FISHER would be someone for the agents to speak with during the investigation.[54]

The indictment, under a heading *FISHER Provides False Information about the Cause of the Crash*, recites that "federal agents" conducted "initial interviews" at WR-ALC (*i.e.*, Robins) in May 2021, and recites that "information provided during these interviews was consistent with the information contained in the JAGMAN report."[55]  The indictment alleges:

During the visit, federal agents interviewed FISHER.  FISHER told federal agents that he heard a rumor that *maintenance technicians may not have detected the cracking and corrosion within the P2B4* Corroded Propeller Blade because they had been *relying on "tribal knowledge,"* rather than the Tech Manuals, *to incorrectly perform penetrant inspections*.  FISHER did not inform federal agents that System Program Office engineers had approved a Blanket Form 202 in 2011 removing penetrant inspections of propeller taper bores.[56]

Here three things should be remembered.  First, when Fisher was interviewed in May 2021, the "criminal investigation" was "into *the cause* of the Yanky 72 crash" and "[t]he targets of the investigation were the unnamed *maintenance personnel* whose *gross negligence*, according to the JAGMAN Report, was primarily responsible for the Yanky 72 crash."[57] The purpose and focus of the investigation, then, was why cracking and corrosion alleged in the JAGMAN report to have been present within P2B4 when it arrived at WR-ALC (*i.e.*, Robins) in August 2011 to be overhauled was

---

[54]See *Indictment* (p. 17, ¶ 69) [Doc #: 3].

[55]See *Indictment* (p. 18, ¶ 70) [Doc #: 3].

[56]See *Indictment* (p. 18, ¶ 71) [Doc #: 3].

[57]See *Indictment* (p. 17, ¶ 68) (emphasis added) [Doc #: 3].

not detected. In other words, the purpose and focus of the investigation was to determine what specifically happened with P2B4. Second, the effectiveness and results of any penetrant inspection that might have "detected the cracking and corrosion within the P2B4 Corroded Propeller Blade" is necessarily entirely dependent upon the competence, skill, and diligence of the technician performing such an inspection. (The actual FPI process has been discussed, *supra*.) If the "maintenance technicians" performing the FPI were relying upon "tribal knowledge," they may have been taking unauthorized shortcuts (such as not applying a sufficient amount of penetrant, or not thoroughly coating the surface with sufficient penetrant, or wiping the penetrant from the surface too quickly before the penetrant had sufficient time to be effective, or perhaps using an incorrect technique during the visual inspection with the blacklight) that reduced or negated the efficacy of the FPI procedure. Finally, the indictment charges Fisher with making "materially false" statements and concealing "material" facts "relevant to the ... federal criminal investigation ... into the ***cause of the Yanky 72 crash*** ...."[58] Again, the indictment states that "a criminal investigation in the Northern District of Mississippi into ***the cause*** of the Yanky 72 crash" was opened and that "[t]he targets of the investigation were the unnamed maintenance personnel whose gross negligence, according to the JAGMAN Report, was primarily responsible for ***the Yanky 72 crash***."[59] (Yanky 72 crashed on July 10, 2017.[60])

---

[58] See *Indictment* (pp. 25-27, ¶¶ 98-101) (emphasis added) [Doc #: 3].

[59] See *Indictment* (p. 17, ¶ 68) (emphasis added) [Doc #: 3].

[60] See *Indictment* (p. 1, ¶ 1) [Doc #: 3].

The indictment alleges: "Federal agents discovered that in August 2011, engineers at Robins authorized the removal of *a critical inspection procedure* for detecting C-130 propeller blade defects."[61] The indictment further specifically alleges:

> JAMES MICHAEL FISHER was the C-130 lead propulsion system engineer at Robins from 2011 to 2022. FISHER was the primary engineer responsible for C-130 propeller maintenance in 2011. FISHER was also one of the key decisionmakers who removed *the critical inspection procedure in August 2011*. As the lead engineer responsible for C-130 propeller maintenance, FISHER was primarily responsible for providing federal agents during the criminal investigation with information regarding what inspections procedures were in place *in the late summer of 2011*.[62]

(The statement "FISHER was also one of the key decisionmakers who removed the critical inspection procedure in August 2011" is completely false, as will be discussed, *infra*.) The indictment (at p. 21, ¶ 85) states that Fisher "*voluntarily* provided the August 22 Form 202" to federal agents on July 21, 2021, and the indictment (at pp. 21-22, ¶¶ 86-88) further states:

> 86.    FISHER, whose name was on the Form 202 denied knowing about its existence and denied approving it. Specifically, Fisher stated that he would not have approved removal of penetrant inspections because deviating from penetrant inspections would result in corrosion going undetected. ... FISHER stated that he could not understand why his System Program Office colleagues would approve such a Form 202. FISHER further claimed that he would never have approved the August 22 Form 202 because in 2011 there were problems with the reliability of eddy current probes.

> Like the August 22 Form 202, FISHER'S name appeared on the October 26 Form 202, but he was not the assigned or approving engineer, which was consistent with his statement to federal agents that he would not have approved the August 22 Form 202.

> 88.    FISHER's *statement* that he would have never removed the penetrant inspections *was false*. Federal agents later uncovered the August 19, 2011, email in which FISHER stated that he had "no problem" removing penetrant inspections and

---

[61] See *Indictment* (p. 2, ¶ 4) (emphasis added) [Doc #: 3].

[62] See *Indictment* (p. 2, ¶ 5) (emphasis added) [Doc #: 3].

also discovered other Blanket Form 202s in 2012 and 2013 in which FISHER, as the assigned engineer, had recommended removal of penetrant inspections.[63]

The indictment further alleges:

96.     On or about ***December 2, 2021***, federal agents conducted a recorded interview with FISHER. During the interview, FISHER again denied being aware of Blanket Form 202s before his July 2021 meeting with federal agents. Federal agents again asked FISHER ***whether he approved the August 22 Form 202***. FISHER again ***denied approving it*** and again stated that he would have never approved it because of the concerns about the reliability of eddy current probes. FISHER again stated that he could not understand why his colleagues would have approved it. FISHER also stated that Level 3 technicians were not helpful during this time because they would not respond to his requests for assistance. Federal agents finally ***confronted FISHER with his August 19, 2011 email***. FISHER denied remembering the email and stated that, regardless, his colleagues should not have approved the Blanket Form 202 without doing their own research.[64]

While the 27-page, 101-paragraph indictment includes within its text reproductions of images depicting a "C-130 Propeller Blade Taper Bore" (p. 4, ¶ 12) and the "Blade Numbering System" for a C-130 aircraft (at p. 10, ¶ 40), strangely missing from the indictment (as either an inclusion in the text or as an attached exhibit) are copies of either the "August 22 Form 202" or the "August 19, 2011 email" even though the "August 22 Form 202" is either specifically mentioned or referenced in no less than 20 of the 101 paragraphs in the *Indictment* (to-wit: ¶¶ 4, 5, 27, 28, 29, 32, 33, 35, 43, 45, 55, 58, 85, 86, 87, 91, 92, 95, 96, and 99) – essentially 20-percent of the *Indictment* discusses or references the "August 22 Form 202." The "August 19, 2011 email" the Government claims as the basis for the approval of the "August 22 Form 202" is specifically mentioned or referenced in seven paragraphs in the *Indictment* (to-wit: ¶¶ 30, 31, 32, 88, 95, 96, and 99). Even though neither the "August 22 Form 202" or the "August 19, 2011 email" are included within or attached to the indictment, together the "August 22 Form 202" and the "August 19, 2011 email" are mentioned or

---

[63]See *Indictment* (p. 22, ¶¶ 85-88) (emphasis added) [Doc #: 3].

[64]See *Indictment* (pp. 24-25, ¶ 96) (emphasis added) [Doc #: 3].

referenced in 23 of the indictment's paragraphs (which is 22-percent of the indictment) and together they both form essentially the very foundation of the indictment's charges against Fisher; therefore, even though they were not made exhibits to the indictment, both the "August 22 Form 202" and the "August 19, 2011 email" should be considered by as being constituent parts of the indictment.[65]

The plain text on the faces of the "August 22 Form 202" and the "August 19, 2011 email" demonstrates critical information that the Government failed to include in the indictment.  First, the "August 19, 2011 email" written by Fisher is dated "Friday, August 19, 2011 2:31:26 PM" and is in response to an email sent "Friday, August 19, 2011 12:54 PM" to Fisher from Daniel Buchanan wherein Buchanan wrote:

> TO 3h1-18-3 states Penetrant inspect taper board [sic] IAW ASTM E 1417.  We are doing that with the assistance of a 202 to use *method C portable*.  *We still do the eddy current after as required, problem is we are finding cracks with eddy current and not the Penetrant* do [sic] to back round.  Any way to do away with the Penetrant inspection as is very time consuming and we do the back up anyway.  *Your thoughts* and if we can do without Penetrant how do you want to handle the operation in the work control doc. Thanks waiting to hear from you.[66]

---

[65]A true and correct copy of the "August 22 Form 202" is attached to the Defendant's motion as "Exhibit B," while a true and correct copy of the  "August 19, 2011 email" is to the Defendant's motion as "Exhibit C."

[66]See "Exhibit C" (*i.e.*, the "August 19, 2011 email") (emphasis added).  Here it should be pointed out that "method C portable" (*i.e.*, the wipe-on and wipe-off process) was used at WR-ALC (*i.e.*, Robins) because, as the indictment specifically points out WR-ALC (*i.e.*, Robins) "did not have the capability to fully immerse C-130 propeller blades as required by both Tech Manuals."  See *Indictment* (p. 8; ¶ 28) [Doc #: 3].

It should also be noted that the initial email from Daniel Buchanan was also sent ("Cc") to no less than 23 other recipients (to-wit:  William H. Stillman; Jeremy T. Adams; Daniel Bailey; Mark W. Brashear; Marvin H. Brown; Haley Childs; James E. Cole; Pamela J. Duvall; Edward F. Dyke; Julius R. Jones; Nathaniel Kelly; Thomas A. Lindsey; Michael C. Myers; Helen F. Mulvaney; Roy J. Patterson; Rocky L. Ray; Harold J. Robinson; Bobby L. Ross; Isiah Rouse; Stacey Rumph; Morris L. Smith; Ted A. Waters; and William B. Worsham).  The face of the "August 22 Form 202" reflects that William H. Stillman was one of the persons who approved it.

(Note that Buchanan was asking for Fisher's "thoughts" and not Fisher's approval. Note also that Buchanan stated "we are finding cracks with eddy current" and did not express any problems or reliability concerns with the EC inspections.) Fisher's response to this inquiry, the "August 19, 2011 email" that the Government identifies as crucial evidence supporting the Government's allegation of Fisher making "materially false ... statements," states:

> I guess I didn't realize that we were using both dye penetrant and eddy current on the taper bore. I don't think it should be a surprised that *eddy current will ID damage that dye penetrant misses* on this surface because *the taper bore is shot peened* which inherently leaves a compressive layer across the substrate. This compressive layer will tend to *hide damage from a dye penetrant inspection*. I have no problem with removing the requirement for dye penetrant.[67]

Again, Buchanan's email asked for Fisher's "thoughts" (not Fisher's approval), and what Fisher logically and reasonably stated in Fisher's reply email is the simple and undeniable fact that attempting a fluorescent penetrant inspection (*i.e.*, FPI) on a surface that has been "shot peened" is a waste of time, effort, and material because shot peening compresses the surface and closes any cracks, leaving no crack into which the penetrant to seep.[68] Fisher also stated his belief that "... eddy current will ID damage that dye penetrant misses ...."

The face of the "August 22 Form 202" (which the Government seemed to believe was a "smoking gun" for placing blame for "... the cause of the Yanky 72 crash ..." upon Fisher) reflects that the "INITIATOR" for this "Nonconforming Technical Assistance Request and Reply" (*i.e.*,

---

[67] See "Exhibit C" (*i.e.*, the "August 19, 2011 email") (emphasis added).

[68] What is "shot peening"? Most laymen have at least a passing familiarity with the sand-blasting process wherein high-pressure compressed air is used to blow sand through a tool to strip away material such as old paint from a concrete wall. The shot peening process is mechanically similar, and uses high-pressure compressed air to blow "shot" (usually small metal beads approximately half the size of the head of a sewing pin) against a surface to burnish or polish the surface, and during this process compression of the surface causes any cracks in the surface close up. If the cracks have been closed up during shot peening, any penetrant simply cannot penetrate and cracking will not be observable.

Form 202) was "Johnnie Hamm" and that it was sent to "William Stillman" and received "8/22/2011 5:02.21 AM."[69]   Box 14 of the "August 22 Form 202" is captioned *DEFICIENCY AND RECOMMENDATIONS*, where it is stated:

> REQUESTING TO REMOVE THE DYE PENETRANT OPERATION AND JUST THE EDDY CURRENT OP ONLY.  PER MIKE FISHER: C-130 PROPULSION SYSTEM ENGINEER.  Eddy current will ID damage that dye penetrant misses on this surface because the taper bore is shot peened which inherently leaves a compressive layer across the substrate.  This compressive layer will tend to hide damage from a dye penetrant inspection.  I have no problem with removing the requirement for dye penetrant.[70]

It is quite obvious that three sentences written by Fisher in the "August 19, 2011 email" were simply copied and pasted by Johnnie Hamm into Box 14.  Box 22 of the "August 22 Form 202" is captioned *INSTRUCTIONS* and contains the text:

> Approval is given to use eddy current as primary inspection method in blade taper bore.  Changes will be made to TO-3H1-18-3.[71]

Box 26 (captioned *COORDINATION/APPROVAL*) reflects that the approval for this Form 202 was "SIGNED" by "ENGINEER" William Stillman (on "8/22/2011 9:19:03 AM") and by "SM/SCM ENGRG APPROVAL AUTHORITY" Jeff Morris (on "8/22/2011 9:52:25 AM").[72]  "Part C" (captioned *MAINTENANCE APPROVAL*) of this Form 202 reflects that Johnnie Hamm (who initiated this Form 202) signed his approval as "PLANNER" (on "8/22/2011 12:56:34 PM") and

---

[69]See "Exhibit B" (*i.e.*, the "August 22 Form 202").  William Stillman was one of the recipients of the initial the "August 19, 2011 email" initiated by Daniel Buchanan. See "Exhibit C" (*i.e.*, the "August 19, 2011 email")

[70]See "Exhibit B" (*i.e.*, the "August 22 Form 202").

[71]See "Exhibit B" (*i.e.*, the "August 22 Form 202").

[72]See "Exhibit B" (*i.e.*, the "August 22 Form 202").

Daniel Buchanan (who initiated the initial "August 19, 2011 email" to Fisher) signed his approval as "MAINTENANCE SUPERVISOR" (on "8/22/2011 3:20:31 PM").[73]

Of critical relevance here are two facts. First, while the indictment alleges Fisher "gave his approval to remove penetrant inspections in an August 19, 2011 email" (see *Indictment* at pp. 25-26, ¶ 99), this is a gross misstatement of fact: Fisher, himself, in the subject email, ***did not approve anything!*** Instead, Fisher, who'd been asked to give his "thoughts," stated his ***opinion*** in the "August 19, 2011 email" that EC inspection would reveal ***damage that would not be revealed by FPI*** "because the taper bore is ***shot peened*** which inherently leaves a compressive layer across the substrate" and the "compressive layer will tend to hide damage from a dye penetrant inspection."[74] Next, neither Fisher's name or signature are found ***anywhere*** on the "August 22 Form 202" as an ***approving authority***; instead, the persons named as approving the Form 202 were William Stillman, Jeff Morris, Johnnie Hamm, and Daniel Buchanan. In fact, the only place where Fisher's name appears on the Form 202 is where Johnnie Hamm, as the "initiator" of the Form 202 request, copied and pasted three sentences from Fisher's response to the "the August 19, 2011 email."

Here, key allegations in the indictment should again be reviewed. First, the indictment (at p. 2, ¶ 3) states that the purpose of the criminal investigation was "to attempt to ***identify the individuals*** at Robins whose gross negligence was ***responsible for the crash***."[75] The indictment (at p. 2, ¶ 4) also alleges: "Federal agents discovered that in August 2011, engineers at Robins authorized removal of a ***critical*** inspection procedure for detecting C-130 propeller blades."[76] The

---

[73]See "Exhibit B" (*i.e.*, the "August 22 Form 202").

[74]See "Exhibit C" (*i.e.*, the "August 19, 2011 email") (emphasis added).

[75]See *Indictment* (p. 2, ¶ 3) (emphasis added) [Doc #: 3].

[76]See *Indictment* (p. 2, ¶ 4) (emphasis added) [Doc #: 3].

indictment states that the "engineers who approved the August 22 Form 202 became the focus of the investigation."[77] The indictment (at p. 2, ¶ 5) further alleges that Fisher "was the primary engineer responsible for C-130 propeller maintenance in 2011" and further alleges "FISHER was also one of the key decisionmakers who removed the ***critical inspection procedure*** in August 2011."[78]  Thus, Fisher became a "focus" of the investigation.  The indictment (at p. 8, ¶ 28) alleges: "Before August 22, 2011, maintenance technicians were required to perform wipe-on penetrant inspections ..." and alleges (at p. 8, ¶ 29) that "[b]efore August 22, 2011, maintenance technicians were required to perform eddy current inspections on all Navy C-130 propeller blades ...."  The indictment alleges (at p. 9, ¶ 33) that on August 22, 2011, "System Program Office engineers recommended and approved the request" for a Form 202 removing the FPI requirement "and penetrant inspections were removed pursuant to the August 22, 2011 Blanket Form 202 ('August 22 Form 202')."  The indictment (at p. 13, ¶ 52) alleges that "... Navy engineers concluded that the P2B4 Corroded Propeller Blade had cracking and corrosion in the taper bore ***before*** it was submitted for inspection at Robins in August 2011."[79]  Finally, the indictment (at p. 16, ¶ 65) quotes from the JAGMAN Report's findings that "... the corrosion was advanced enough in 2011 that it ***should*** have been detected ... at [Robins] in 2011."[80]

The afore-stated alleged facts led the Government to believe that the "August 22 Form 202" was the proverbial "smoking gun" the Government needed "to identify the individuals at Robins

---

[77]See *Indictment* (p. 22, ¶ 91).

[78]See *Indictment* (p. 2, ¶ 5) (emphasis added) [Doc #: 3].

[79]See *Indictment* (p. 13, ¶ 52) (emphasis added) [Doc #: 3].

[80]See *Indictment* (p. 16; ¶ 65) (emphasis added) [Doc #: 3].  Again, Yanky 72 was a Lockheed KC-130T Hercules aircraft and was the property of the United States Marine Corps ("USMC"); therefore, maintenance procedures applicable to Yanky 72 were those of the United States Navy ("Navy").

whose gross negligence was responsible for the crash" since the Government believed the individuals who approved the "August 22 Form 202" had "removed the **critical inspection procedure**" (*i.e.*, FPI) that would have detected the corrosion in P2B4, and identification of the corrosion would have prevented the crash.[81] Thus, under the Government's investigative theory, every person at WR-ALC (*i.e.*, Robins) responsible for approving the "August 22 Form 202" was grossly negligent. These persons, identifiable because their names appear on "August 22 Form 202" as having approved it, are: William Stillman, Jeff Morris, Johnnie Hamm, and Daniel Buchanan (as has been noted above, neither Fisher's name or signature are found **anywhere** on the "August 22 Form 202" as an **approving authority**). Under the Government's investigative theory, then, these named individuals were culpable under the federal manslaughter statute for the deaths of all 16 servicemen who died in the Yanky 72 crash and subject to indictment.[82] This was the very reason why "a criminal investigation in the Northern District of Mississippi" was opened in 2020.[83] Just as the July 10, 2017, crash of Yanky 72 had been a world-wide news event, so too the indictment of employees of a defense contractor (*i.e..*, WR-ALC) whose negligent acts caused the deaths of 16 servicemen would have been a major news event; the indictment likely would've been announced at a press conference in Washington, D.C., by the United States Attorney General personally (with the federal investigators and assistant United States attorneys responsible for the indictment standing on the dais flanking the Attorney General), which likely would've been the lead news story for every network's evening news program as well as front page news in *The New York Times*.

---

[81] See *Indictment* (p. 2, ¶¶ 3) (emphasis added) [Doc #: 3].

[82] See 18 U.S.C. § 1112(a).

[83] See *Indictment* (p. 2, ¶ 3) (emphasis added) [Doc #: 3].

Yet no one was ever indicted for manslaughter arising from the Yanky 72 crash. Why? The JAGMAN report recited that P2B4 had its last overhaul performed by WR-ALC in **September 2011**.[84] The indictment alleges (at p. 9, ¶36) "the P2B4 Corroded Propeller Blade" underwent inspection and overhaul at WR-ALC (*i.e.*, Robins) that "was completed by September 12, 2011."[85] However, the indictment (at p. 10, ¶ 39) also recites: "***It is not clear when*** or ***what inspections*** were performed on the P2B4 Corroded Propeller Blade because the Work Control Documents were destroyed pursuant to Air Force policy."[86] The ***date*** when P2B4 ***was actually inspected*** would be ***a critical fact*** necessary to support manslaughter charges based upon the Government's theory that the removal of the "critical inspection procedure" (*i.e.*, FPI) by the "August 22 Form 202" allowed the "P2B4 Corroded Propeller Blade" to be placed into inventory and then installed upon Yanky 72. What the Government actually discovered were records reflecting that P2B4 had ***completed*** the inspection process ***before*** August 22, 2011, and that when P2B4 was inspected, the procedures in place required ***both*** FPI and EC inspection; therefore, with regard to P2B4, the "critical inspection procedure" (*i.e.*, FPI) ***had not been removed***, and any changes to C-130 propeller blade inspection procedures conducted at WR-ALC (***i.e.***, Robins) made by the "August 22 Form 202" had no connection whatsoever with the inspections of P2B4 and any changes made by the "August 22 Form 202" were completely ***irrelevant*** to the ***cause*** of the Yanky 72 crash – a fact that the Government has essentially admitted. The Government has stated that "the biggest supporting factor" for its decision not to seek a manslaughter indictment against Fisher is because ".... criminal investigators

---

[84]See "Exhibit A" (JAGMAN report: p. 28, ¶ 145) (emphasis added).

[85]See *Indictment* (p. 1, 9; ¶¶ 2, 36) [Doc #: 3].

[86]See *Indictment* (p. 10; ¶ 39) (emphasis added) [Doc #: 3].

**PAGE 25 OF 36**

learned ... there was evidence to support that the blade was processed before August 22, 2011."[87] This means that the "August 22 Form 202" was, and is, completely *irrelevant to the crash* of Yanky 72 – it is not the "smoking gun"; if it had been the "smoking gun," there would have been indictments, and the persons indicted would've been the persons named on the face of the "August 22 Form 202" as having approved it (to-wit: William Stillman, Jeff Morris, Johnnie Hamm, and Daniel Buchanan).

Since the actual facts did not support the Government's investigative theory and there could be no manslaughter indictment for the deaths of the 16 servicemen to publicize (and no public appearance of the federal investigators and assistant United States attorneys on a dias alongside the Attorney General at a major press conference news event at "main justice" in Washington, D.C.), whither did the Government go next in its investigation? Who could be indicted, and on what charge?

### E.  PROCESS CRIMES.

The indictment (at p. 23, ¶ 92) makes the contradictory allegation that following a July 21, 2021, interview with Fisher (in which Fisher *voluntarily* produced two Form 202s, the "August 22 Form 202" and an "October 26 Form 202"), "Federal agents now understood that they could *no longer trust* FISHER to provide Form 202s."[88] The indictment reflects that the Government believed Fisher made false statements to investigators on July 21, 2021. Why? First, because Fisher, "whose name was on the Form 202" as alleged in the indictment, denied having knowledge of the "August

---

[87]See *Government's Response in Opposition to Defendant's Motion in Limine to Dismiss Indictment for Improper Venue* (at p. 13, fn. 10) [Doc. #: 39], a true and correct copy of which is attached as "Exhibit D" to the Defendant's motion.

[88]See *Indictment* (p. 23; ¶ 91) (emphasis added) [Doc #: 3].

22 Form 202" prior to "... his July 2021 meeting with federal agents."[89]  Next, because Fisher "denied approving it."[90]  Also because Fisher "stated that he would not have approved removal of penetrant inspections ..." when the investigators mistakenly believed that Fisher had given his approval to the "August 22 Form 202."[91]  (Here, to reiterate, the persons **who did approve** the "August 22 Form 202" – William Stillman, Jeff Morris, Johnnie Hamm, and Daniel Buchanan – are readily identifiable because their names appear on "August 22 Form 202" specifically as having approved it, while Fisher's name or signature **are not** found **anywhere** on the "August 22 Form 202" as an **approving authority**; remember, Buchanan's "August 19, 2011 email" did not request Fisher's approval, only his "thoughts" about a change.[92])  Furthermore, the agents mistakenly believed Fisher couldn't be trusted because Fisher "... claimed that he would never have approved the August 22 Form 202 because in 2011 there were problems with the reliability of eddy current probes."[93]  Finally, the agent's  belief that Fisher could not be trusted was grounded upon the agent's mistaken belief that Fisher had approved the "August 22 Form 202" (which, the agents believed, had "removed the **critical inspection procedure**" (*i.e.*, FPI) that would have detected the corrosion in P2B4), which undoubtedly created  the agents' mistaken belief that: Fisher was culpable regarding the cause of the crash of Yanky 72; Fisher had knowledge of his culpability; and, Fisher was corruptly attempting to cover up his culpability by concealing evidence, making false statements, and attempting to impede the investigation.

---

[89]See *Indictment* (pp. 22, 24; ¶¶ 86, 96) [Doc #: 3].

[90]See *Indictment* (p. 22; ¶ 86) [Doc #: 3].

[91]See *Indictment* (p. 22; ¶ 86) [Doc #: 3].

[92]See "Exhibit B" (*i.e.*, the "August 22 Form 202"), and see "Exhibit C" (*i.e.*, the "August 19, 2011 email").

[93]See *Indictment* (p. 22; ¶ 86) [Doc #: 3].

As previously thoroughly discussed, *supra*, Daniel Buchanan emailed Fisher on August 18, 2011, in which Buchanan stated "... We still do the eddy current after as required, problem is we are finding cracks with eddy current and not the Penetrant ..." and then inquired "Any way to do away with the Penetrant inspection as is very time consuming and we do the back up anyway."[94]  Fisher's response was:  :

> I guess I didn't realize that we were using both dye penetrant and eddy current on the taper bore.  I don't think it should be a surprised that *eddy current will ID damage that dye penetrant misses* on this surface because *the taper bore is shot peened* which inherently leaves a compressive layer across the substrate.  This compressive layer will tend to *hide damage from a dye penetrant inspection*.  I have no problem with removing the requirement for dye penetrant.[95]

What should be apparent here is that while the indictment (at p. 22, ¶ 86) alleges "FISHER further claimed that he would not have approved the August 22 Form 202 because in 2011 there were problems with the reliability of eddy current probes" in the email exchange there was no discussion whatsoever of EC inspections *failing* to identify damage.[96]  Buchanan specifically stated "... we are finding cracks with eddy current and not the Penetrant ..."  Again, the Government (and the language of the indictment) misapprehends and misrepresents what is meant when the "reliability of eddy current probes" as has been discussed *supra*.  Buchanan's email makes it quite plain that technicians at WR-ALC (*i.e.*, Robins) *were* quite successfully "... finding cracks with eddy current ..." and that EC inspections were discovering cracks FPI failed to reveal – and if FPI was failing to discover cracks it certainly was not a dependable and "critical inspection procedure" as the indictment claims.

"Count One" of the indictment alleges that Fisher:

---

[94]See "Exhibit C" (*i.e.*, the "August 19, 2011 email").

[95]See "Exhibit C" (*i.e.*, the "August 19, 2011 email") (emphasis added).

[96]See *Indictment* (p. 22; ¶ 86) [Doc #: 3].

> ... did willfully and knowingly conceal and cover up by scheme a ***material fact*** ... by ***representing*** on multiple occasions to criminal investigative federal agents ... that ***he was not aware*** of Nonconforming Technical Assistance Request and Reply Forms, known as Form 202s, ***relevant*** to the a [sic] federal criminal investigation ... into ***the cause*** of the Yanky 72 crash ....[97]

The indictment specifically mentions five (5) "Blanket Form 202s" (the indictment states these are dated: August 22, 2011; October 26, 2011; November 14, 2012; March 6, 2013; and July 23, 2013).[98] The indictment (at p. 23, ¶ 92) plainly states that, following a July 21, 2021, interview, Fisher ***voluntarily*** produced two Form 202s, the "August 22 Form 202" and an "October 26 Form 202." As has already been discussed, *supra*, the inspection of the P2B4 propeller blade that's been deemed to be the cause of the Yanky 72 crash was conducted ***prior*** to August 22, 2011; therefore, assuming, *arguendo*, the allegation in "Count One" that Fisher represented to investigators "he was not aware" of the other three Form 202s (dated: November 14, 2012; March 6, 2013; and July 23, 2013) is a factually correct allegation, these Forms 202s ***were not*** relevant regarding "... ***the cause*** of the Yanky 72 crash ..." and such a statement from Fisher is neither material or relevant to the cause of the crash. Therefore, "Count One" does not charge a violation of 18 U.S.C. §1001(a)(1), and "Count One" should be dismissed.

"Count Two" of the indictment alleges that Fisher:

> ... did unlawfully and knowingly ***make materially false***, fictitious, and fraudulent statements and representations ... by stating to criminal investigative federal agents ... he would never have removed the penetrant inspections on August 22, 2011. The statements and representations were false because, as FISHER then and there knew, ***he gave his approval*** to remove penetrant inspections ***in an August 19, 2011, email***, and he recommended removal of that procedure on November 14, 2012, March 6,

---

[97]See *Indictment* (p. 25, ¶ 98) [Doc #: 3].

[98]See *Indictment* (pp. 22, 24; ¶¶ 87, 94) [Doc #: 3].

**PAGE 29 OF 36**

2013, and July 23, 2013, in violation of Title 18, United States Code, Section 1001(a)(2).[99]

As has been discussed, *supra*, in the "August 19, 2011, email" Fisher merely responded (logically and reasonably) to Daniel Buchanan's email asking for Fisher's "thoughts" about removing FPI, and part of Fisher's response was copied and pasted into the "August 22 Form 202" that was initiated (or written) by Johnnie Hamm, and Fisher's name or signature ***are not*** found ***anywhere*** on the "August 22 Form 202" as an ***approving authority***. Also, again, these Forms 202s ***were not*** relevant regarding the ***cause*** of the Yanky 72 crash and as such are neither material or relevant to the investigation. Therefore, "Count Two" does not charge a violation of 18 U.S.C. §1001(a)(2), and "Count Two" should be dismissed.

"Count Three" of the indictment alleges that Fisher:

... did corruptly ***attempt to conceal*** documents, that is, Nonconforming Technical Assistance Request and Reply Forms, known as Form 202s, with the intent to impair their availability for use in an official proceeding, that is, a grand jury ***investigation into the cause of the Yanky 72 crash*** arising out of the Northern District of Mississippi, in violation of Title 18, United States Code, Section 1512(c)(1).[100]

Again, the indictment (at p. 23, ¶ 92) plainly states that, following a July 21, 2021, interview, Fisher ***voluntarily*** produced two Form 202s, the "August 22 Form 202" and an "October 26 Form 202." The indictment specifically mentions only five (5) "Blanket Form 202s" (the indictment states these are dated: August 22, 2011; October 26, 2011; November 14, 2012; March 6, 2013; and July 23, 2013).[101] The inspection of the P2B4 propeller blade that's been deemed the cause of the Yanky 72 crash was conducted ***prior*** to August 22, 2011; therefore, assuming, *arguendo*, the allegation in "Count Three" that Fisher "attempt[ed] to conceal" the other three Form 202s (dated: November 14,

---

[99]See *Indictment* (pp. 25-26, ¶ 99) [Doc #: 3].

[100]See *Indictment* (pp. 26-27, ¶ 100) [Doc #: 3].

[101]See *Indictment* (pp. 22, 24; ¶¶ 87, 94) [Doc #: 3].

**PAGE 30 OF 36**

2012; March 6, 2013; and July 23, 2013) is a factually correct allegation, these Forms 202s **were not** relevant regarding "... **the cause** of the Yanky 72 crash ..." and such an act of concealment (which is emphatically and specifically denied by Fisher) cannot be a violation of 18 U.S.C. § 1512(c)(1) as is charged in the indictment. Therefore, "Count Three" should be dismissed.

Finally, "Count Four" of the indictment alleges that Fisher:

> ... did knowingly **conceal and cover up** documents and tangible objects, that is, Nonconforming Technical Assistance Request and Reply Forms, known as Form 202s, **with the intent to impede**, obstruct, and influence a federal criminal investigation ... into **the cause** of the Yanky 72 crash, a matter that the defendant knew and contemplated was within the jurisdiction of ... departments and agencies of the United States, in violation of Title 18, United States Code, Section 1519.[102]

Again, the indictment (at p. 23, ¶ 92) plainly states that, following a July 21, 2021, interview, Fisher **voluntarily** produced two Form 202s, the "August 22 Form 202" and an "October 26 Form 202." The indictment specifically mentions only five (5) "Blanket Form 202s" (the indictment states these are dated: August 22, 2011; October 26, 2011; November 14, 2012; March 6, 2013; and July 23, 2013).[103] The inspection of the P2B4 propeller blade that's been deemed to be the cause of the Yanky 72 crash was conducted **prior** to August 22, 2011; therefore, assuming, *arguendo*, the allegation in "Count Four" that Fisher did "... **conceal and cover up** documents ... known as Form 202s, with the intent to impede, obstruct, and influence a federal criminal investigation ... into **the cause** of the Yanky 72 crash ..." is a factually correct allegation, these Forms 202s (dated: November 14, 2012; March 6, 2013; and July 23, 2013) **were not** relevant regarding "... **the cause** of the Yanky 72 crash ..." and such an act of concealment (which is emphatically and specifically

---

[102]See *Indictment* (p. 27, ¶ 101) [Doc #: 3].

[103]See *Indictment* (pp. 22, 24; ¶¶ 87, 94) [Doc #: 3].

denied by Fisher) cannot be a violation of 18 U.S.C. § 1519 as is charged in the indictment.

Therefore, "Count Four" should be dismissed.

### III.  APPLICABLE LAW AND ARGUMENT

The Fifth Circuit, addressing 18 U.S.C. §1001, has noted that statements are material within the meaning of Section 1001 when they have the natural tendency or capacity to deceive, affect, or influence the federal agency. See, *e.g.*, *United States v. Age*, 136 F.4th 193, 218 (5ᵗʰ Cir. 2025) (citing *United States v. Richardson,* 676 F.3d 491, 505 (5th Cir. 2012).  The Fifth Circuit has stated:

> Proof of a violation of § 1001 consists of five elements: "(1) a statement, that is (2) *false* (3) and *material*, (4) made with the *requisite specific intent*, [and] (5) within the purview of government agency jurisdiction." *United States v. Puente,* 982 F.2d 156, 158 (5th Cir.1993) (quoting *United States v. Lichenstein,* 610 F.2d 1272, 1276 (5th Cir.1980)). ... § 1001(a) (2) explicitly includes a materiality requirement. The "statements [must] be 'material' to the Government inquiry, and that 'materiality' is an element of the offense that the Government must prove." *United States v. Gaudin,* 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

*U.S. v. Najera Jimenez*, 593 F.3d 391, 399 (5ᵗʰ Cir. 2010) (emphasis added).  The Fifth Circuit further stated:

> In *Gaudin*, the Supreme Court provided an analytical framework for determining the materiality of a statement and whether such a statement could influence a government decision:
>
>> Deciding whether a statement is "material" requires the determination of at least two subsidiary questions of purely historical fact: (a) "what statement was made?" and (b) "*what decision was the agency trying to make?*" The ultimate question: (c) "whether the statement was material to the decision," requires applying the legal standard of materiality ... to these historical facts.
>
> *Id.* at 512, 115 S.Ct. 2310. The Court described the legal standard of materiality as follows: "The statement must have 'a natural tendency to influence, or [be] *capable of influencing, the decision of the decisionmaking body to which it was addressed*.' " [Citations omitted.]

*Najera Jimenez*, 593 F.3d at 399 (emphasis added).

Here, "the decision of the decisionmaking body" that was to be made was whether "gross negligence" of "unnamed maintenance personnel" was "was primarily responsible for the Yanky 72 crash."[104]  The investigators initially thought the "August 22 Form 202" removed a "critical inspection procedure" (*i.e.*, the penetrant inspection) but it was found later that, specifically with regard to P2B4, the alleged  "critical inspection procedure" (*i.e.*, FPI) ***had not*** been removed, and any changes to C-130 propeller blade inspection procedures conducted at WR-ALC (***i.e.***, Robins) made by the "August 22 Form 202" (and subsequent Form 202s) had no connection whatsoever with the ***cause*** of the Yanky 72 crash; therefore, any act, actions, or statements by Fisher regarding the "August 22 Form 202" (and any subsequent Form 202s) as alleged in the indictment were not material under the case law (*e.g.*, *United States v. Age* and *U.S. v. Najera Jimenez*) since they could never have identified any "unnamed maintenance personnel" who was "was primarily responsible for the Yanky 72 crash." In the absence of the necessary element of materiality, the Government cannot sustain the charges of Section 1001 violations made in "Count One" and "Count Two" and those charges must be dismissed pursuant to FED. R. CRIM. P. Rule 12(B)(v) for failure to state an offense.

Furthermore, the face of the indictment shows that the Government does not possess the necessary facts to prove violations of 18 U.S.C. § 1512(c)(1) and/or 18 U.S.C. § 1519 as alleged in "Count Three" and "Court Four," respectively.  The indictment (at p. 23, ¶ 92) plainly states that Fisher voluntarily produced Form 202s that the Government considered essential to its investigation; therefore, the allegation in "Count Three" that Fisher "did corruptly attempt to conceal ... Form 202s is contradicted by the plain language of the indictment. Additionally, the Form 202s identified in the indictment (to-wit: "August 22 Form 202"; "October 26, 2011" Form 202; "November 14, 2012"

---

[104]See *Indictment* (p. 17, ¶ 68) [Doc #: 3].

Form 202; "March 6, 2013" Form 202; and, "July 23, 2013" Form 202) were created *after* P2B4 had completed the inspection process and the Form 202s were completely irrelevant to the "... investigation ... into the *cause* of the Yanky 72 crash ..." (emphasis added) and, therefore, there was no attempt by Fisher to "... conceal and cover up documents ... with the intent to impede a federal criminal investigation ... into the cause of the Yanky 72 crash ..." as alleged in "Count Four." The criminal charges alleged in "Count Three" and "Count Four" reflect the Government's belief that Fisher sought to "corruptly" conceal and hide his culpability in causing the crash of Yanky 72 when, in truth and in fact, Fisher had no culpability whatsoever, and, since there was no culpability to hide, there was no concealment or "cover up" attempted by Fisher as alleged in "Count Three" and "Count Four," and these counts cannot be sustained by the Government and should be dismissed pursuant to FED. R. CRIM. P. Rule 12(B)(v) for failure to state an offense.

## IV. CONCLUSION

The very foundation of the charges against Fisher made in the indictment are the "August 22 Form 202" and the "August 19, 2011 email" – these two documents are referenced or quoted in more than 20-percent of the indictment's paragraphs.[105] The indictment alleges Fisher approved the "August 22 Form 202" via the "August 19, 2011 email," but the face of these two documents plainly demonstrates that the indictment grossly misrepresents the content of both documents: Fisher merely offered his *opinion* in the "August 19, 2011 email" and Fisher *was not* a dispositioning or approving authority for the "August 202 Forms 202." The indictment also grossly misrepresents acts, actions, and statements by Fisher as being part of a corrupt cover-up attempt when, in truth and in fact, Fisher

---

[105]The "August 22 Form 202" is either specifically mentioned or referenced in no less than 20 of the 101 paragraphs in the *Indictment* (to-wit: ¶¶ 4, 5, 27, 28, 29, 32, 33, 35, 43, 45, 55, 58, 85, 86, 87, 91, 92, 95, 96, and 99), while the "August 19, 2011 email"is specifically mentioned or referenced in seven paragraphs in the *Indictment* (to-wit: ¶¶ 30, 31, 32, 88, 95, 96, and 99).

had no culpability whatsoever regarding the cause the crash of Yanky 72, and Fisher voluntarily produced the "August 22 Form 202" that the Government alleges is evidence of Fisher's culpability.

Therefore, when all the premises are considered, all four counts of the indictment should be dismissed.

RESPECTFULLY SUBMITTED, this, the 6th day of OCTOBER, 2025.

**JAMES MICHAEL FISHER,** *Defendant*

**By:s/Steven E. Farese, Sr.**
STEVEN E. FARESE, SR. (MS #5137)
*Attorney for James Michael Fisher*

ATTORNEY FOR DEFENDANT:

Steven E. Farese, Sr.
FARESE, FARESE & FARESE, P.A.
Post Office Box 98
Ashland, Mississippi 38603
Telephone:     662-224-6211
Facsimile:     662-224-3229

## CERTIFICATE OF SERVICE

I, STEVEN E. FARESE, SR., attorney for Defendant James Michael Fisher, hereby certify that I have on this date electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all parties of record, to-wit: Defendant's Memorandum in Support of Motion to Dismiss Indictment and I hereby certify that I have mailed by United States Postal Service the document to the following non-ECF participant(s): N/A

THIS, the 6th day of OCTOBER, 2025.

s/Steven E. Farese, Sr.
STEVEN E. FARESE, SR. (MS #5137)
FARESE, FARESE & FARESE, P.A.
Attorneys at Law
Post Office Box 98
122 Church Street
Ashland, Mississippi 38603
Telephone:     662-224-6211
Facsimile:      662-224-3229
